

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **SHARON L. DUNCAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action Number:** |
| | ) | **4:15-CV-00743-SGC** |
| **v.** | ) | |
| | ) | **ORAL ARGUMENT** |
| **DAVITA HEALTHCARE PARTNERS,** | ) | **REQUESTED** |
| **INC., formerly doing business as** | ) | |
| **DaVita, Inc. And DaVita Renal** | ) | |
| **Healthcare, Inc.** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

## PLAINTIFF'S RESPONSE TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

---

*/s/ Kenneth D. Haynes*

Kenneth D. Haynes
Charles E. Guerrier
Attorneys for Sharon Duncan

**OF COUNSEL:**
HAYNES & HAYNES, P.C.
1600 Woodmere Drive
Birmingham, AL 35226
(205) 379-0377 Telephone
(205) 379-3572 Facsimile

TABLE OF CONTENTS

I.   PLAINTIFF'S RESPONSE TO DEFENDANT'S
     STATEMENT OF UNDISPUTED FACTS. . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  ADDITIONAL STATEMENTS OF  FACTS. . . . . . . . . . . . . . . . . . . . . . 10

III. ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

     A.   Ms. Duncan Can Establish her Asthma-Based Disability Claim.. . . 26

          1.   Ms. Duncan's Asthmatic Condition Is A Disability.. . . . . . . . 27

          2.   Mixing Glycol Acetic Acid Is Not An Essential
               Function Of A PCT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

          3.   Davita Did Not Accommodate Ms. Duncan.. . . . . . . . . . . . . 34

     B.   Davita Used Ms. Duncan's Back Injury As A Means Of
          Getting Rid Of Ms. Duncan Because Of Her Asthma... . . . . . . . . . . 36

     C.   A Reasonable Jury Could Conclude That Davita Terminated
          Ms. Duncan Because She Engaged In Protected Activity.. . . . . . . . 39

IV.  CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

     CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

I.    PLAINTIFF'S   RESPONSE   TO   DEFENDANT'S   STATEMENT   OF
UNDISPUTED FACTS

2.    Disputed. Bicarbonate is not mixed with glycol acetic acid. Pl. Ex. 2, Ethridge

Aff. ¶4.  Not all PCTs are required to mix the chemicals used in dialysis. Doc. 105-1,

Duncan 99-101.

3.    Disputed.  Pl. Ex. 2, Ethridge Aff. ¶3.  Objection. While Gycol acetic acid may

be "present" in all areas where dialysis is performed, this fact seeks the benefit of an

improper inference that the fumes, to which Duncan is sensitive, are "present" in all

areas of Davita's clinics.  This is not correct.

4.    Disputed. Pl. Ex. 2, Ethridge Aff. ¶4.  Objection: Duncan does not testify that

the mixing is "constant," only that the acid would have to be prepared before the

mixed batch ran out or got low.  The word she used was "consistently."  Further,

Duncan was not testifying about "bicarb" but about glycol acetic acid. Def. Ex. 1,

Duncan 73.  The bicarbonate solution is mixed three times a day and is not mixed at

that same time as glycol acetic acid.  Pl. Ex. 2, Ethridge Aff. ¶4.

6.    Admitted but irrelevant.  Duncan does not have an allergic reaction to bicarb.

Def. Ex. 1, Duncan 136-137.

9.    Disputed only in that Duncan experienced problems mixing glycol acetic acid

mixture and not bicarbonate. Def. Ex. 1, Duncan 86, 137.

10.    Disputed. The record citation does not support that the glycol acetic acid was taken to the bicarb room. Def. Ex. 1, Duncan 67-69.

14.    Disputed.  The note states that Duncan should 'avoid cemical [sic] fumes x 1 wk" and be rechecked when she returns to the doctor's office in 3 days.  Def. Ex. 9.

16.    Disputed.  The note does not say that she "could not be exposed to chemical fumes until re-evaluation."  Rather, the instructions to the patient is "avoid cemical [sic] fumes x 1 wk, recheck at that time."  Def. Ex. 9.

17.    Disputed. Dr. Moore did not tell Duncan that she must cease mixing bicarb or any other chemical.  Rather, Dr. Moore states: "MAY RETURN TO WORK. MUST TAKE OSHA RECCOMENDED [sic] PRECATIONS [sic] WHEN MIXING GLACIAL [sic] ACETIC ACID.  PT NEEDS TO CEASE MIXING CHEMICALS IF PNEUMONITIS SYMPTOMS REOCCUR." The record citation does not support problems mixing bicarb. Pl. Ex. 2, Duncan Aff. ¶2.

18.    Disputed that Duncan had a rash. Her face was burned by the glycol acetic acid, not the bicarb. Def. Ex. 1, Duncan 85, 141.  Undisputed that after the initial injury Duncan returned to work and, after her face healed, she attempted to mix the glycol acetic acid. Each time she would mix the acid she would notice that her breathing would be impaired such that she was sent to the hospital.  Def. Ex. 1, Duncan 84-86.

20.    Undisputed but irrelevant.  Duncan never had any health-related issues mixing

2

the bicarb.

21.     Disputed. The record citation does not support the statement, "failing to show up for her shift."

26.     Undisputed but irrelevant.  Duncan was taking prescription and over-the-counter medications which can produce positive test results for amphetamines, barbiturates, and benzodiazepines.    See https://thcdetox.biz/blog/can-cause-false-positive-barbiturates/ (as visited on July 2, 2018) and https://www.goodrx.com/blog/these-15-medications-can-cause-a-false-positive-on-drug-tests/ (as visited on July 2, 2018).  Object to any inference that Duncan was abusing controlled substances.

30.     Disputed. The record citation does not support the statement that Duncan informed Davita of her "sensitivity to glycol acetic acid."  De Jesus merely states that he became aware of Duncan's sensitivity to glycol acetic acid in October 2012.  He does not state that Duncan told him or Davita about this sensitivity. Duncan's medical records establish that she developed sensitivity to glycol acetic acid following the spilling incident in January 2012.

31.     Disputed. The testimony cited does not support the factual statement.  Ward states that "at one point, there was only one nurse and one tech in the building." Ward identifies neither the period of time when this situation existed nor whether this

condition would have existed during the shift to which Duncan would have been assigned. The non-specific reference to "emergency situations" does not support the broad conclusion that there was a real or foreseeable risk that Duncan would have to mix acid if she had been placed in this facility. Further, Ward testified that Davita made sure there was always a PCT available in the building in the event of non-routine mixing necessities. Def. Ex. 3, Ward 156. Finally, because the Birmingham East facility had three shifts, there were two shifts to which Duncan could have been assigned where the risk would not exist. Def. Ex. 3, Ward 120; Pl. Ex. 2, Ethridge Aff. ¶6.

32.    Disputed. The record citation is to Plaintiff's Counsel reading Davita's EEOC Position Statement. To the extent this evidence is offered by Davita, it is hearsay for which no exception exists. Rule 801, Fed. R. Evid. The statement in the Position Statement is not supported by any exhibit, declaration, or affidavit. Ward's answer does not confirm the information contained in the statement. Def. Ex. 3 Ward 152-153.

33.    Disputed and misleading. Duncan promptly delivered her doctor's note (Doc. 108-1, dated October 1, 2012) to Davita. That doctor's note states: "There is no reason why she cannot continue at her work except for the fact that she should not be involved in mixing the materials that have caused the sensitization and the acute

4

asthmatic attacks. She does not have to use her inhaler during her regular job. Therefore, can still be involved in doing dialysis on patients at the facility at which she works." Davita did not accept this conclusion and, on October 23, 2012, Davita sought additional information from Duncan's doctor. Doc. 109-1.

38.    Disputed. Duncan is testifying about what she believes Elizabeth Ethridge knows. As such her testimony is conjecture and improper. To the extent this testimony can be attributed to Duncan, her testimony establishes that she could work in the Birmingham East facility provided the employees of the facility followed the safety rules established by Davita and made certain the door to the mixing room was closed so as to prevent fumes from entering other areas of the facility. Object to any inference that, ordinarily, Duncan would be exposed to the fumes created by the proper mixing of glycol acetic acid everywhere within the Birmingham East facility.

43.    Disputed. The record citation does not support the statement that Kiker was "confused." Rather, despite the fact that Dr. Goldstein was never asked about Duncan being able to mix bicarb, and Dr. Goldstein did not identify any problems with mixing bicarb, Kiker concluded, on her own, that Duncan could not mix bicarb. Compare Docs. 109-3 and 109-4.

46.    Disputed. The record citation does not support the conclusion that Duncan experienced tightness in her chest "after taking care of patients." Duncan was in

Kiker's office when she experienced the tightness in her chest. She does not recall leaving in an ambulance after being in Kiker's office.  Doc. 108-2 Duncan 37-39.

48.     Dispute the use of the word "clarified" and any inferences that may arise from that word.  Dr. Goldstein's responses were never confusing or unclear.  The response which Dr. Goldstein provided on December 10, 2012, was essentially the same as the response he provided months earlier.  Compare Docs. 109-6,  108-6, and 109-3.

49.     Undisputed that Sedgewick Claims Management Services, Inc., acting as an agent for Davita, did not accept Dr. Goldstein's response.  Ignoring Dr. Goldstein's only recommended restriction, *i.e.* that Duncan should be in the room while glycol acetic acid is being mixed, Sedgewick sought a new opinion based upon the vague conclusion that glycol acetic acid is "present" in all areas of the work environment and claiming that it is impossible to ensure that Duncan is not exposed to it.  Disputed as to Davita's motive for seeking this new opinion. The record citation does not support all of the factual statements included in this paragraph.

53.     Object.  This statement is conclusory and is not supported by any specific facts. "[C]onclusory allegations without specific supporting facts have no probative value." *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000).

54.     Dispute inference based upon the phrase "in order to return Ms. Duncan to work."  Duncan was fully capable of performing her job at the Birmingham East

6

facility.   Davita refused to accommodate Duncan at the Birmingham East facility unless she could return to work with no restrictions.   Pl. Ex. 3, Berry Aff. ¶6.

55.    Disputed. Pl. Ex. 4, Duncan Aff. ¶5.

59.    Disputed as to context. Duncan was faced with hostility upon arriving at the Ensley Clinic. Jackie Ward told Duncan that if it had been up to her, she would not have rehired Duncan and she would not have made any accommodations to Duncan's physical impairment.  Ward told Duncan that she would be watched closely.  Duncan felt threatened by Ward.  Def. Ex. 1, Duncan 141-144.  Ward's testimony, to the extent it differs from that of Duncan, creates a genuine dispute as to this fact.

62.    Disputed.  DeJesus told Duncan that unless she got Dr. Goldstein to tell Davita that she could mix the glycol acetic acid, she would not get a job anywhere with Davita.  Def. Ex. 1 Duncan 144.

73.    Disputed in part. The system at use in the Prison Clinic used acid that was pre-mixed.  No one mixed acid in the Prison Clinic.  Def. Ex. 1, Duncan 148 and 159.

74.    Disputed. Def. Ex. 42, Reaume 92-93.

75.    Disputed that Ms. Duncan failed to call work to let anyone know she would be coming in.  Duncan called and spoke to Tryna Sims and told her she would not be coming in.  That same day Duncan also sent a fax pertaining to her visit to the emergency room after speaking to Cindy Mallen. Def. Ex. 1, Duncan 59, 183-84.

7

77.     Disputed in that the record citation does not support the last sentence. Defendant has not identified any evidence that supports the conclusion that Davita could not accommodate Duncan's request.

78.     Disputed. Duncan did not "take" a medical leave of absence from Davita. Duncan was placed on medical leave by Davita and not permitted to return until such time as she had no work restrictions. Def. Ex. 1, Duncan 186-87.

80.     Disputed. Pl. Ex. 2, Ethridge Aff. ¶11; Def. Ex. 1, Duncan 155-58.

81.     Disputed. Pl. Ex. 2, Ethridge Aff. ¶11; Def. Ex. 1, Duncan 155-58.

82.     Disputed. The record citation does not support the statement, "After consulting with multiple different people at Davita..."

83.     Disputed. The record citation does not support the statements, "actively working to accommodate her restrictions . . ." Def. Ex. 50, p. 001298.

84.     Disputed. Pl. Ex. 2, Ethridge Aff. ¶11; Def. Ex. 1, Duncan 157.

85.     Disputed. Pl. Ex. 2, Ethridge Aff. ¶11; Def. Ex. 1, Duncan 157.

86.     Disputed. Pl. Ex. 2, Ethridge Aff. ¶11; Def. Ex. 1, Duncan 157.

87.     Disputed. Ms. Duncan did not request a "designated" runner and the records cited do not support that statement.

88.     Disputed. The secretarial position was an example used by Ms. Duncan.  Def. Ex. 1, Duncan at 167.

90.    Disputed. The record citation does not support the factual statement.

93.    Disputed. Ms. Reume testified that Ms. Faruzzi was hired from another Dialysis company, Fresenius. Def. Ex. 42, Reame 102.

94.    Disputed. Ms. Reume testified that Ms. Faruzzi was hired from another Dialysis company, Fresenius. Def. Ex. 42, Reame 102.

96.    Disputed. This phone conversation took place in December 2012 because Ms. Brashear was no longer the disability specialist involved in 2013. Def. Ex. 25, Brashear 54-55; Def. Ex. 19 Duncan Vol. II 43-44.  See also Pl. Ex. 4, Duncan Aff. ¶2.

97.    Disputed in that record citation only supports the last sentence.

98.    Disputed. Pl. Ex. 41; Def. Ex. 32, DeJesus 174-76. Plaintiff was released to return to work with no restrictions on December 16, 2013.

100.   Disputed. Def. Ex. 1, Duncan 176-77.

101.   Disputed. Def. Ex. 57 is not a document that was produced during discovery.

102.   Disputed as incomplete.

105.   Disputed. Def. Ex. 57 is not a document that was produced during discovery.

109.   Disputed as argumentative and immaterial. Pl. Ex. 13; Def. Ex. 51, Velasquez 100-101.

II.    ADDITIONAL STATEMENTS OF FACTS

1.      Sharon Duncan ("Duncan") began employment with Davita as a Patient Care Technician ("PCT") September 13, 2010 at Davita's Birmingham East facility.  Pl. Ex. 17.

2.      As a PCT, Duncan's duties included weighing patients to determine how much fluid to pull off;  taking vital signs;  observed and documented patient's information and notified the RN if anything was abnormal; checked access point to determine if it was working properly;  and administering dialysis by making sure patients received the correct bath; wiped down, set up and test machines between patients. Mixing glycol acetic acid is not one of the duties identified on the written job description. Def. Ex. 1, Duncan 180,  Pl. Ex. 16.

3.      Duncan, like all other PCTs, was trained on how to mix chemical solutions used in the dialysis process including glycol acetic acid solutions and bicarbonate solutions. Def. Ex. 1, Duncan at 95.

4.      Although trained to mix the acid mixtures, not all PCTs had to mix acid. Def. Ex. 1, Duncan 100.

5.      Prior to Duncan's on the job injury in September 2011, Davita reviewed Duncan's job performance and gave her a merit increase that was approved by Jackie Ward, Group Facility Administrator an Paula Radeke, Facility Administrator. Def.

Ex. 1, Duncan 96-97; Def. Ex. 3, Ward 23-24.

6.      Commenting on Duncan's evaluation, Radeke wrote: " Sharon is studying to complete the PCT certification exam. Sharon is a very hard worker who continues to pull extra shift in order to help to fill the needs of the open PCT positions." "Great teammate !!" Pl. Ex. 12 and 13.

7.      On January 2, 2012, Duncan accidentally broke a bottle of glycol acetic acid and inhaled the fumes. Duncan was treated at the emergency room and released to return to work the following day. Def. Ex. 1, Duncan 67-68.

8.      Duncan continued mixing glycol acetic acid after her accident, but experienced complications each time. Duncan continued to until September 2012, when she experienced shortness of breath at work and again received emergency medical treatment. Def. Ex. 1, Duncan 129-130. She requested and was approved to see Dr. Allan Goldstein a pulmonologist. Def. Ex. 1, Duncan 85-86 and Pl. Ex. 54.

9.      Duncan was seen by Dr. Goldstein as a workers' compensation referral on October 1, 2012.  He determined that Duncan had been sensitized to glycol acetic acid and recommended that she avoid the fumes emitted when substance was mixed. He stated that there was no reason why she could not continue at her work except that she should avoid mixing the materials that caused the sensitization and the acute asthmatic attacks. Pl. Ex. 55.

10.     On October 4, 2012, Dr. Goldstein completed an FMLA health certification and determined that it would be medically necessary for Duncan to be absent from work during flare-ups. Pl. Ex. 14, p. 3.

11.     October 12-23, 2012 Davita took Duncan off the work schedule claiming it could not accommodate the restrictions of Dr. Goldstein. Pl. Ex. 18.

12.     On October 18, 2012, Dr. Goldstein noted that Duncan was in the emergency room two days ago. He started her on Symbicort and released her to return to work as long as she is not exposed to glycol acetic acid. Pl. Ex. 57.

13.     On October 19, 2012, Dana Kiker, Facility Administrator at Birmingham East, received and shared Duncan's restrictions which stated: "Sharon Duncan may return to work as long as not exposed to glacial acetic acid, the building is otherwise safe for her." Pl. Ex. 15

14.     Although Duncan was due to be evaluated in September 2012, Ward ignored Duncan's requests and displayed a negative demeanor toward Duncan. Def. Ex. 1, Duncan 108.

15.     On October 23, 2012, Andrea Brashear, Davita's Disability Specialist, requested a fitness for duty evaluation from Dr. Goldstein in which she attached a job description and outlined in a letter the acid mixing requirements. At the end of the material, Brashear attached a questionnaire for Dr. Goldstein to complete. Pl. Ex. 16

and 59.

16.    On October 23, 2012, Edward Berry, Duncan's workers' compensation attorney, wrote to Dana Kiker and requested that Davita accommodate Duncan's disability by allowing her to return to work and perform her regular duties with the exception of mixing the glycol acetic acid. Pl. Ex. 17.

17.    On November 8, 2012, Dr. Goldstein completed Ms. Brashear's questionnaire, stating: "She cannot mix the glycol acetic acid. She can do all other aspects of her job." Pl. Ex. 19 and 58.

18.    Dr. Goldstein noted on November 8, 2012, "The patient comes in today at the request of her employer for me again to tell them that she cannot be exposed to glycol acetic acid. It causes her to have asthma. She can do all of the other aspects of her job and she is very much qualified to do those parts of her job, namely dialysis and patient care." Pl. Ex. 60.

19.    Duncan has no restrictions on mixing bicarbonate or any other chemicals. Def. Ex. 1, Duncan 137.

20.    On November 16, 2012, Duncan was suspended for not following the procedure for closing the bicarbonate mix tank on November 14 and for not completing the cleaning of the bicarbonate room on November 12. Pl. Ex. 35.

21.    On November 19, 2012, Edward Berry wrote to Davita regarding Davita's

reluctance to accommodate Duncan's restrictions and Davita suspending Duncan for events that historically had not been made the subject of discipline. Pl. Ex. 36.

22.    On December 10, 2012, Dr. Goldstein wrote a letter to Andrea Brashear in which he sought to clarify questions that Davita sought to communicate to him through Duncan. Dr. Goldstein made clear that no one from Davita had contacted him regarding his answers to the November 8, 2012, questionnaire. Dr. Goldstein clarified that Duncan cannot go inside the mixing room when the glycol acetic acid is being made, but can be in the room at other times, as soon as 30 minutes after the acid is made. Goldstein elaborated further and stated she may be in the building all day long whether the glycol acetic acid is being made or not. Pl. Ex. 59.

23.    Dr. Goldstein did not think it was appropriate to have the patient relay information to and from the doctor. He thinks the company should go directly to the doctor and he gets called to clarify restrictions all the time from employers, insurance adjusters and workers' compensation case managers. Def. Ex. 40, Goldstein, pgs. 43-45.

24.    Duncan was involuntarily removed from the work schedule and not allowed to work from November 2012 to April 29, 2013, despite the fact that her treating physician determined she could perform all aspects of her job except for mixing glycol acetic acid.  Pl. Ex. 42; Def. Ex. 1, Duncan 139.

14

25.     To accommodate her restrictions, Duncan offered to switch her work days to

those in which acid was not scheduled to be mixed and to pick up extra chores. Def.

Ex. 1, Duncan 101.

26.     On January 29, 2013, Dr. Goldstein noted that Duncan has had 3 or 4 episodes

of acute bronchospasms following removal from work for about 2 months.  Pl. Ex.

61.

27.     In January and February 2013, Edward Berry continuously wrote to Davita

asking that Duncan be allowed to return to work under the restrictions outlined by Dr.

Goldstein. Pl. Ex. 3, 40, 42 and 43.

28.     On March 5, 2013, Dr. Goldstein noted:

> "She has not gone back to work yet. She states the employer is waiting
> on me to "answer questions." I have answered everything they have
> asked. I am not sure what else they want me to do but I have told the
> patient that if she will have them write to me I will be happy to answer
> whatever they asked. If they are looking for someone to guarantee that
> there will not be an asthma attack, that is not possible. The patient has
> really done well up away from work and at this point there is no reason
> for me to believe that she cannot go back to work as long as she stays
> away from the glacial acetic acid."

In his plan, Dr. Goldstein wrote, "The patient can return to work any time her

employer will allow her to go back to work. I have not told her that she cannot go

back to work. That is the employer's decision. Copies this to Andrea Brashear and

Edward Berry." Pl. Ex. 62.

29.    In response to Duncan's EEOC Charge, Davita stated:

 "From November 2012 to March 2013, Davita worked with Charging
Party - who had to take medical leave to avoid exposure to the acid - to
get the medical information it needed. In April 2013, Davita finally received clear
restrictions from Charging Parties physician: she could not mix the acid or be near an
acid spill but could be in the same clinic as the acid."

Pl. Ex. 7, Pl. Ex. 48, Resp. Int. 4.

30.    All of the information that Davita suggested to the EEOC that was finally

provided by Duncan's physician in April 2013, was actually provided by Dr.

Goldstein on or before December 10, 2012. Def. Ex. 32, DeJesus Depo. 232.

31.    The information that Davita received from Dr. Goldstein in March 2013 is

contained in Pl. Ex. 51; Def. 32, DeJesus, 75-78.

32.    In a phone conversation with DeJesus, Kiker, Brashear and Talya, Duncan

offered to get yet a fourth note from Dr. Goldstein, but DeJesus responded, "No, no,

no, we – we don't need another note from your doctor. . . ." Pl. Ex. 52, p. 30-31. 33.

33.    Mixing glycol acetic acid is not included in Davita's written job description for

Patient Care Technician as an essential duty or responsibility. (Def. Ex 48, Doc. 111-

1).

34.    Not every PCT is required to mix acid. Def. Ex. 1, Duncan 100.

35.    On April 28, 2013, Duncan met with Jackie Ward, who stated to Duncan that

she would not get a clean slate and she would be terminated if she messed up. Ward

16

told Duncan that if it were up to her Duncan would not have been accommodated and allowed to work. She reminded Duncan that she would be closely watched.  Pl. Ex. 26, Def. Ex. 1, Duncan 140-141.

36.     Davita allowed Duncan to return to work on April 29, 2013, at Davita's Ensley facility. Davita stated to the EEOC, "[I]n order to return Charging Party to work, Davita looked for a clinic with enough PCTs and space to safely allow Charging Party to perform her duties without encountering the acid. The Ensley Clinic, which was slightly further away than the Roebuck Clinic, had a large mixing room Davita believed could accommodate Charging Party's restrictions, and it had more PCTs to share the acid-mixing responsibilities." Pl. Ex. 25, Pl. Ex. 7, p. 2, ¶2.

37.     From April 29, 2013 until July 1, 2013, Duncan worked in the Ensley facility without any asthmatic incident or episode. Def. Ex. 32, DeJesus 126.

38.     The Ensley position did not provide the same employment opportunities as Duncan enjoyed at the Birmingham East facility. Duncan's work hours were reduced from 40-70 hours per week to 27-30 hours per week. Def. Ex. 1, Duncan 141.

39.     The Ensley facility was further from Duncan's Odenville, AL home and she requested to transfer to the St Clair Prison facility. On July 1, 2013, Duncan transferred to the St. Clair Prison facility. Pl. Ex. 47

40.     On July 21, 2013 Duncan had an asthmatic episode that caused her to seek

emergency treatment. The following day, July 22, 2013, Duncan reported off sick from work. She received a final written warning because management maintained that she did not call. Def. Ex. 1, Duncan 59-62.

41.    On September 11, 2013, Duncan injured her back and was required to seek medical treatment. Duncan was released to return to work on light duty with certain lifting restrictions. Pl. Ex. 48; Def. Ex. Duncan 151-152; 166-69.

42.    On October 18, 2013, Duncan was seen by Dr. Andrew Cordover, an orthopedic physician with Andrews Sports Medicine and Orthopaedic Center. Pl. Ex. 73 and 74, pg. Pl. Ex. 1, Cordover, pg. 11.

43.    Following his October 18, 2013, office visit, Dr. Cordover released Duncan to return to work with light medium work restrictions which is defined on his pre-printed form as lifting a maximum of 30 lbs. Pl. Ex. 74, pg. 90; Pl. Ex. 1, Cordover 14.

44.    Davita's policy provides:

> **Temporary Return to Work:** When your Workers' Compensation medical provider releases you to return to temporary or light duty work, the Company will attempt to accommodate the restrictions in every way possible. If you are released to light duty, you must report to work, provide your manager with a copy of the medical documentation that evidences you are able to work, and perform light duty work unless you qualify for and seek to continue your leave under the FMLA . . ."

Pl. Ex. 9, p. 5; Def. Ex. 32, DeJesus 168-69, Def. Ex. 51, Velasquez 94-95.

45.    Had Davita not suspended Duncan from November 2012 to April 2013, Duncan would have been eligible for FMLA leave in September 2013.

46.    Despite her attempts to return to work, Davita would not allow Duncan to return to work until she had a full duty release and rejected her requests to explain why she could not return to work. Pl. Ex. 33; Def. Ex. 1, Duncan 166, 168-169. Def. Ex. 42, Reaume 113, Pl. Ex. 50, pgs. 1060-1068.

47.    Following Duncan's September 11, 2013, back injury and prior to termination on January 24, 2014, Davita refused to meet with Duncan to discuss accommodations. Pl. Ex. 35, 36, 38.

48.    Duncan sent multiple text message to Reaume asking that she be allowed to return to work and Reaume would not allow her to return to work until she had no restrictions. Pl. Ex. 50, pgs. 1060-1068.

49.    At the St. Clair Prison facility, there was no lifting that was required of a PCT that exceeded  Dr. Cordover's 30 lb. restrictions. Pl. Ex. 2, Ethridge Aff. ¶11.

50.    At the prison, patient/inmates come to the clinic on their own or with the assistance of a guard. Once they arrived at the door of the clinic, one of two inmate runners would assist them inside the clinic. There is also a prison guard inside the clinic at all times. If a patient is wheel-chair bound, the runner will assist taking the patient's weight while in their chair. If assistance is needed, a runner will assist

patients into the dialysis chair. PCTs are not allowed to touch the patient inmates except to take their blood pressure and stick them for dialysis.  When the patient finishes their dialysis, a runner will assist the patient out of the dialysis chair and in some cases, back into a wheelchair. The only exception is when there was a lock down, but in that rare situation, no patient/inmates or runners are locked inside the clinic. If a patient can not stand, their blood pressure is taken with them sitting. The heaviest thing a PCT had to lift at the prison is a one gallon jug of citric acid or special bath that weighed approximately 10 pounds.

Pl. Ex. 2, Ethridge Aff. ¶10 and Def. Ex.1, Duncan 158-60.

51.     Katherine Velasquez, Davita's Senior Disability Specialist was involved in coaching Duncan's managers in determining whether accommodations could be made relative to her back condition. Def. Ex. 51, Velasquez 8, 37-38, 40.

52.     The decision on whether or not Davita can offer a reasonable accommodation rests solely with the Facility Administrator and the Group Administrator. Def. Ex. 51, Valasquez 37.

53.     Duncan told Velasquez that the prison clinic had runners who did the heavy lifting. Velasquez related that request back to Jackie Ward, Group Facility Administrator who told Velasquez that was not true and the runners could not come inside the clinic. Def. Ex. 51, Velasquez 64-65.

54.     Following her September 2013 injury, Duncan and her workers' compensation attorney Edward Berry wrote to Davita requesting that her temporary restrictions be accommodated and Davita failed and/or refused to respond to the requests. Pl. Ex. 3, Berry Aff and Pl. Ex. 35, 36, 38.

55.     Davita refused to allow Duncan to return to work until she had a release from her physician returning her to work without restrictions - full duty because doing so would create a "sheltered position." Pl. Ex. 39; Pl. Ex. 50, p. 19, 27; Def. Ex. 42, Reaume 113.

56.     On October 10, 2013, Duncan saw Dr. Goldstein and he noted that she has done well since he last saw her with the exception of being in the emergency room on July 21 through 22 of this year with an acute asthmatic attack. Pl. Ex. 65.

57.     On November 1, 2013, Duncan filed an EEOC Charge based on disability, race and retaliation. Pl. Ex. 4, Duncan Aff. ¶4.

58.     On November 4, 2013, Duncan had an epidural steroid injection in her back which provided relief from her syptoms. Pl. Ex. 1, Cordover, 18-19, Pl. Ex. 74, pg. 61.

59.     Dr. Cordover saw Duncan again following her epidural steroid injection on November 13, 2013. He recommended another injection on the right side . Pl. Ex. 1, Cordover, pgs. 21-22. Dr. Cordover was not aware that his 30 lb. restriction was

keeping Duncan from returning to work and had he known the company had a requirement that Duncan lift up to 35 lbs. it would have been safe for her to return lifting up to 35 lbs.  Pl. Ex. 1, Cordover at 27-29.

60.     Davita filled Duncan's PCT position at St. Clair Prison with Catherine Faruzzi, an employee from outside the company. Def. Ex. 42, Reaume 102.

61.     On December 13, 2013, Dr. Cordover faxed to Yvette Reume a work status report releasing Duncan to return to work on December 16, 2013, with no restrictions with regard to her back injury. Duncan's restrictions of not mixing glycol acetic acid remained. Pl. Ex. 41; Def. Ex. 32, DeJesus 174-76.

62.     On January 22, 2014, Dr. Cordover determined that Duncan had reached maximum medical improvement and determined she had a five percent impairment rating under the AMA Guides to Permanent Impairment. Pl. Ex. 1, Cordover, pgs. 31-32.

63.     Dr. Cordover reviewed the PCT job description and testified that as it related to her back condition, Duncan could perform the job as described. Even though the job required lifting up to 35 lbs and his restriction at the time was 30 lbs, had he been asked he would have concluded she could lift up to 35 lbs. Dr. Cordover used a pre-printed form that separated maximum lifting by weights 30lbs - 50lbs - 75 lbs, etc. Pl. Ex. 1, Cordover 33-34; Pl. Ex. 75, p. 90.

64.    On December 31, 2013, Duncan saw Dr. Goldstein and he noted that patient has had more trouble with her asthma. She has had one emergency room visit. She gets short of breath if she is exposed to cold weather, warm weather or several of the irritants. Pl. Ex. 66.

65.    Davita told Duncan that because her PCT position at the prison had already been filled, she had 30 days to apply for other open jobs for which she was qualified and could perform within her acid-mixing restrictions. Pl. Ex. 51,  Velasquez 81-82; Pl. Ex. 43, p. 2.

66.    Davita told the EEOC that there were no open PCT positions at the Ensley facility where Duncan had previously worked. That statement was untrue. Unbeknownst to Duncan, Davita had an opening at the Ensley facility, but did not tell Ms. Duncan. Pl. Ex. 7, p. 4; Pl. Ex. 49, Int. Resp. 17; Def. Ex. 32, DeJesus  187, 226-27, 243-44.

67.    Davita hired LaTarcha Stallworth, an external candidate,  on January 17, 2014, who began working at the Ensley facility on January 27, 2014. Pl. Ex. 53, DeJesus 226-27.

68.    Not only did Davita not tell Duncan about the PCT position at the Ensley facility, Davita did not tell or offer Duncan a position at any other facility. Def. Ex. 32, DeJesus 185-89.

23

68.   Davita's policy provides: **Permanent Return to Work:**

When your Workers' Compensation medical provider releases you to full duty and/or back to your usual job, the Company will return you to your former position or, if that position is no longer available, we will attempt to reinstate you to the first available of like pay and status (or a lesser job if requested by you). A refusal of an offer for like pay and status will be considered your resignation. Failure to return to work by the end of your approved leave will be considered a voluntary resignation."

Pl. Ex. 13; Def. Ex. 51, Velasquez 100-101.

70.   Davita did not follow its return to work policy and it had an opening at the Ensley facility where Duncan had successfully worked under her restrictions. Def. Ex. 32, DeJesus Depo. 190-91.

71.   Duncan learned that there were open PCT positions at Leeds and Centerpoint. Duncan applied for both positions. Duncan was told that the Leeds position was filed prior to her application. Duncan was told that she did not qualify for the Centerpoint position unless and until Dr. Goldstein lifted her restrictions with respect to mixing the acid and provided her with a full duty release. Pl. Ex. 42, 43; Def. Ex. 32, DeJesus 192-94; Def. Ex. 1, Duncan 177.

72.   On December 19, 2013, Katherine Velasquez, Sr. Disability Specialist, told Duncan in a phone conversation that there were no open positions that could accommodate her restrictions from mixing acid. Pl. Ex. 43; Def. Ex. 51, Velasquez

136.

73.     Velasquez told Duncan in order to apply for a PCT position at a facility that mixed acid, she would need a return to work order from Dr. Goldstein allowing her to mix glycol acetic acid. Def. Ex. 1, Duncan 177.

74.     On January 14, 2014, Duncan's workers' compensation attorney requested that Davita reconsider its denial of her accommodation request. Davita terminated Duncan's employment on January 23, 2014. Pl. Ex. 3, 44, 45.

75.     February 18, 2014, Duncan filed a second Charge of Discrimination based on disability discrimination and retaliation. Pl. Ex. 6.

76.     Duncan's asthma causes her shortness of breath and anxiety. Def. Ex. 1, Duncan 193. Duncan experiences attacks for unknown reasons, beyond exposure to glycol acetic acid. *Id*. at 17. Duncan described her condition: "You will just be doing your normal thing, and all of a sudden you just get real hot and your airway just closes, and then you start trying to breathe but you can't breathe, and you start panicking. I end up throwing up trying to get air in, real shaky. It's a real scary event." *Id*. at 17.

77.     Dr. Goldstein described Duncan's condition in a letter to Heidi Newman on March 30, 2015 in the following manner, "Ms. Duncan has occupational asthma. Though she has reached Maximal Medical Improvement, this does not mean she does

not have asthma still. It means that she is at the best asthma control level possible with her illness. People with occupational asthma have a complication referred to as bronchial hyper-responsiveness. This is a nonspecific entity and indicates substances that are considered irritants that never caused a provlem in the past can cause an acute episode of asthma. . ." Pl. Ex. 70.

78.    Duncan has occupational asthma with nonspecific bronchial hyper-responsiveness, which means she was exposed to glycol acetic acid and develops asthma. She subsequently developed symptoms with colognes, cigarette smoke, diesel fumes, household cleaners that never bothered her before. Def. Ex. 40, p. 26.

79.    Duncan has experienced asthmatic attacks since she has left the employment of Davita. Pl. Ex. 71 and 72.

III.    ARGUMENT

A.    Ms. Duncan Can Establish her Asthma-Based Disability Claim.

Under Rule 56(a), Fed. R. Civ. Proc., summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Only after the movant has articulated with references to the record and to the law specific reasons

why it believes there is no genuine issue of material fact must the nonmovant present evidence sufficient to demonstrate an issue for trial." *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 979 (7th Cir. 1996) (citing *Celotex*, 477 U.S. at 323).

Defendant Davita challenges Duncan's disability claims on three grounds[1]: 1) her asthmatic condition is not a disability; 2) she is not a qualified individual with a disability; and 3) Davita either accommodated or attempted to accommodate Ms. Duncan. Davita has not demonstrated that it is entitled to judgment as a matter of law based upon these arguments, and its motion for summary judgment should be denied in its entirety.

### 1.   Ms. Duncan's Asthmatic Condition Is A Disability.

Davita argues that Ms. Duncan's asthmatic condition does not qualify as a disability. Doc. 104, pp. 26-27. But, in order to reach this conclusion, this Court would have to "turn back the clock" and ignore the significant changes which have been made to the Americans With Disabilities Act ("ADA") – changes which were not considered by the authorities relied upon by Defendant.

The ADA defines a disability as "a physical or mental impairment that

---

[1] "[I]f the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision." *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir. 2006).

substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). While the Supreme Court had concluded that the ADA's disability requirement must be "interpreted strictly to create a demanding standard for qualifying as disabled," *Toyota Motor Mfg., Ky, Inc. v. Williams*, 534 U.S. 184, 197 (2002), *overturned by statute*, Pub. L. 110-325 (Jan. 1, 2009), amendments to the ADA overturned *Toyota* and its related progeny ( and expanded the definition of disability. Today, as a result of the ADA Amendments Act of 2008 ("ADAAA"), the disability inquiry is to be made without consideration of "the ameliorative effects of mitigating measures." 42 U.S.C. § 12102(4)(E)(i). An impairment occurring episodically may be considered a disability if it substantially limits a major life activity when active.[2] 42 U.S.C. § 12102(4)(D).

The cases cited by Defendant to support its motion either arose before the ADAAA or are based upon facts substantially different from those presented by Ms. Duncan. *Godbolt v. Trinity Protection Services, Inc.*, 2017 WL 2579020 (D. Md. June 12, 2017) (plaintiff describes single incident where she had symptoms of excessive heat; no medical evidence that she was substantially limited in breathing);

---

[2]Defendant seeks to minimize Ms. Duncan's condition by arguing that "her asthmatic flare-ups did not substantially limit her ability to breathe." Doc. 104 at p. 27. But the evidence contradicts this. During those "flare-ups", Ms. Duncan was hospitalized. Further, it is irrelevant that Ms. Duncan did not suffer flare-ups while working at the Ensley or Prison clinics. The focus is on the condition when it is symptomatic, not when it is asymptomatic.

*Hudson v. Tyson Farms Inc.*, 2018 WL 493294 (M.D. Ga. Jan. 19, 2018) (pro se plaintiff failed to identify a major life activity affected by asthma; plaintiff never needed an inhaler); *Jimenez-Jimenez v. Int'l Hosp. Grp., Inc./Casino del Sol*, 2017 WL 5905529 (D.P.R. Nov. 30, 2017) (court relies upon pre-ADAAA case authority and ignores impact of the ADAAA). Perhaps the most surprising of these authorities is *Jimenez-Jimenez*. The court cites to *López-Cruz v. Instituto dé Gastroenterologia de PR*, 960 F.Supp.2d 367, 371 n. 8 (D.P.R. 2013) for the principle that "[a] number of courts conclude that an individual does not suffer a disability when an impairment only manifests itself when the individual is exposed to an allergen at work." *Jimenez-Jimenez*, \*8. However, the very footnote referenced by the court explains why those cases are no longer valid: "Finally, the aforementioned cases were decided prior to the ADA being amended by the ADA Amendments Act of 2008) ("ADAA"). . . . [T]he ADAA was designed to enlarge the scope of recognized disabilities. . . . Specifically, the ADAA provides that the disability inquiry is to be made without consideration of 'the ameliorative effects of mitigating measures,' 42 U.S.C. § 12102(4)(E)(i), and that an impairment occurring episodically may be considered a disability if it substantially limits a major life activity when active. 42 U.S.C. § 12102(4)(D)." *López-Cruz*, 960 F.Supp.2d at 371 n. 8. 'Substantially limits' is not a demanding standard and it should be construed in favor of expansive coverage, to

the maximum extent permitted by the terms of the ADA.  29 C.F.R. § 1630.2(j)(1)(i).

An individual is substantially limited if she is "unable to perform a major life activity that the average person in the general population can perform." *Lescoe v. Pa. Dept. of Corrections-SCI Frackville*, 464 Fed. Appx. 50, 52 n. 5 (3rd Cir. 2012).  Ms. Duncan's asthma involves more than a brief, one-time episode.  She has been hospitalized on more than one occasion as a result of her asthma.  While some of these events have occurred as a result of exposure to chemicals in the workplace, others have not.  Ms. Duncan uses an inhaler to ameliorate the effects of her asthma. Without this inhaler, Ms. Duncan would not be able to breathe.  Her doctors have all diagnosed Ms. Duncan with asthma which is aggravated by exposure to the mixing of glycol acetic acid.  Ms. Duncan also gets short of breath when she is exposed to cold weather, warm weather, or irritants.  As Ms. Duncan described her condition:

> "You will just be doing your normal thing, and all of a sudden you just get real hot and your airway just closes, and then you start trying to breathe but you can't breathe, and you start panicking.  I end up throwing up trying to get air in, real shaky.  It's a real scary event."

Doc. 105-1, Duncan 193.

The average person in the general population does not experience these severe symptoms when attempting to breathe.  The evidence of record supports the conclusion that Ms. Duncan's asthma limits her ability to breathe, a recognized major

life activity.  *See* 29 C.F.R. § 1630.2(i)(1)(i).  As such, her asthma qualifies as a disability under the ADAAA.

> 2.    Mixing Glycol Acetic Acid Is Not An Essential Function Of A PCT.

Defendant argues that mixing glycol acetic acid is an essential function of being a PCT and, because Ms. Duncan could not do that task, she is not a qualified individual under the ADA.  Doc. 104, pp. 27-30.  While this argument may succeed at trial, it is insufficient to support summary judgment, as there are genuine issues of material fact as to whether mixing glycol acetic acid is, indeed, an essential function of the job of a PCT.

Whether a particular job function is essential is "evaluated on a case-by-case basis by examining a number of factors." *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1230 (11th Cir. 2005) (internal quotation marks and citation omitted).  The court must conduct a fact-specific inquiry into both the employer's description of a job and how the job is actually performed.  *Samson v. Federal Exp. Corp.*, 746 F.3d 1196, 1201 (11th Cir. 2014) (citing *McMillan v. City of New York*, 711 f.3d 120, 126 (2nd Cir. 2013)).  "Whether a job function is essential is a question of fact that is typically not suitable for resolution on a motion for summary judgment." *Samson*, 746 F.3d at 1201 (quoting *Keith v. Cnty. of Oakland*, 703 F.3d 918, 926 (6th Cir. 2013).

There are various rules and regulations relevant to separating "essential" functions from "marginal" functions.  Essential functions are the fundamental job duties of a position that an individual with a disability is actually required to perform.  A position may be essential because the position exists to perform that function, a limited number of employees can perform the function, or the function is highly specialized and requires expertise. 29 C.F.R. § 1630.2(n)(2).  In determining if a task is an essential or marginal function, relevant evidence in this case may include: (1) the employer's judgment as to which functions are essential; (2) a written job description prepared before considering applicants for the position; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the particular employee to perform the function; (5) the work experience of past employees in the position, and (6) the current work experience of employees in similar jobs. 29 C.F.R. § 1630.2(n)(3).

Although an employer's judgment is "entitled to substantial weight in the calculus," this factor alone is not conclusive. *Holly v. Clairson Industries, L.L.C.*, 492 F.3d 1247, 1285 (11th Cir. 2007).  That is because, if it were conclusive, an employer that did not wish to be inconvenienced by making a reasonable accommodation could, simply by asserting that a function is "essential," avoid that clear congressional mandate that employers make reasonable accommodations to

individuals with a disability.  *Id.*

Davita claims that mixing glycol acetic acid is an essential function of the job of a PCT.  Doc. 104, p. 28.  To support this argument, Davita points to the fact that Ms. Duncan mixed the acid both before and after her injury; that she was trained in how to mix the acid; and the task of mixing the acid was performed, by someonw, three times per week.  However, on the other hand, the job description, prepared by Davita for the position of PCT, does not include any reference to the preparation of glycol acetic acid.  Doc. 111-1.  There is no reference to mixing acids under the heading "Patient Care."   It is not mentioned under "Equipment Care." It cannot reasonably be assumed to fall under "Perform other duties and responsibilities as assigned" as the bullet points under that heading related to working overtime, attending meetings, and understanding employment policies.  Glycol acetic acid is one of the supplies used during the dialysis process.  But under "Quality Assurance" the PCT is only required to "Proactively review and report inventories and supply shortages to Facility Administrator."  Doc. 111-1, p. 3. Presumably this function involves reporting to the Facility Administrator when the levels of glycol acetic acid get low.  It is the function of the Facility Administrator, apparently, to respond to this information. While that Administrator might assign the task of mixing more acid to a PCT, that is not an essential function of the PCT.

Further, Ms. Duncan's own experiences suggest that mixing glycol acetic acid was not an essential function of her job.  Ms. Duncan testified that not every PCT mixed the acid.  Doc. 105-1, Duncan 99-101.  Rather, it was up to the Facility Administrator to decide who would mix the acid.  Nobody was assigned to it and not everybody had to mix it.  *Id.*  Elizabeth Etheridge states that when she worked at the Birmingham East facility (2003 to 2013) "there were always enough PCTs present to mix the glycol acetic acid mixture so that no one person would be placed in a position to mix the acid solution, if they could not."  Pl. Ex 3, ¶ 3.

In sum, viewing all the record evidence and reasonable inferences in the light most favorable to Ms. Duncan, a reasonable juror could differ as to whether mixing glycol acetic acid is an essential function of a PCT.  This issues must be resolved by a jury.

3.    Davita Did Not Accommodate Ms. Duncan.

Davita argues that it accommodated Ms. Duncan by finding her another position at the Ensley location.  However, this so-called accommodation came too late.

Ms. Duncan was suspended, without pay, from the Birmingham East facility in November, 2012, despite the fact that she could have worked at that facility with a reasonable accommodation, *i.e.* being relieved of the marginal function of mixing

34

the glycol acetic acid.  Defendant did not find another job for Ms. Duncan until April 29, 2013.  During that five month period, Ms. Duncan was not accommodated. Furthermore, the accommodation which Davita did provide, the transfer to the Ensley facility, could have occurred in November, 2012, without Ms. Duncan suffering any loss of pay.  Furthermore, once Ms. Duncan was transferred to the Ensley facility, she discovered that she would be working substantially fewer hours than she worked at the Birmingham East facility.

The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. 42 U.S.C. § 12111(8).  Reassignment to another position can be a form of reasonable accommodation, but only when the individual cannot perform her existing job with an accommodation.  *See Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1162 (10th Cir. 1999) (collecting cases).  Davita did not attempt to accommodate Ms. Duncan in her position at Birmingham East.  Rather it transferred Ms. Duncan to Ensley, were she worked fewer hours than she did at Birmingham East.   Rather than being an accommodation which would allow her to receive the full benefits of her current job, the transfer amounted to an adverse employment action taken against her solely because of her disability.

35

Neither the facts nor the controlling authority justifies summary judgment in favor of Davita with regard to Ms. Duncan's ADA asthma claim.

B.     Davita Used Ms. Duncan's Back Injury As A Means Of Getting Rid Of Ms. Duncan Because Of Her Asthma.

Davita argues that Ms. Duncan cannot demonstrate that it discriminated against her because of her back injury.  Doc. 104, pp. 31-35.  However, Ms. Duncan has not alleged that Davita's failure to return her to work with the restrictions assigned by Dr. Cordover is a separate violation of the ADA.  Rather, she alleges that a reasonable jury could conclude that Davita used her back injury as an opportunity to rid itself of Ms. Duncan because of her need for an accommodation related to her asthma.  The following facts support this conclusion.

Ms. Duncan injured her back at work on September 11, 2013.  She was placed on temporary work restrictions on September 13, 2013.   During September and October, these work restrictions were reduced as Ms. Duncan's condition improved. Ms. Duncan notified Davita of these changes and requested that she be permitted to return to work on light duty.  On October 3, 2013, Katherine Velasquez called Ms. Duncan on behalf of Davita and told her that Davita was actively working to accommodate her restrictions.  On October 18, 2013, Dr. Cordover, using a  work status form prepared by his clinic, concluded that Ms. Duncan could perform "Light

Medium Work." Pl. Ex. 34. This designation indicated that Ms. Duncan could lift 30 pounds maximum. The next category on this form, "Medium Work" contains a 50 pound limitation. There is no category on this form that conforms to the qualification standard included as a job requirement for a PCT: 35 pounds. Dr. Cordover has testified that, if he had been asked to provide his opinion as to whether or not Ms. Duncan could perform the duties of a PCT, including lifting 35 pounds, he would have answered "Yes." However, unlike how Davita responded to Ms. Duncan's request for an accommodation for her asthma, no one from Davita contacted Dr. Cordover to get him to clarify his restrictions or to determine whether or not Ms. Duncan could meet that listing standard. On October 31, 2013, Ms. Velasquez notified Ms. Duncan that Davita had learned from Sedgewick, Davita's third-party workers compensation administrator, that Ms. Duncan's medical restrictions would be in effect until at least November 4, 2013. Ms. Velasquez told Ms. Duncan that if she was not medically released on November 4, Davita would need to move forward to fill her position at the Prison Clinic. Nevertheless, she also promised that Davita would wait until November 19 to fill her position. There is no evidence that Ms. Velasquez, or anyone else associated with Davita, contacted Dr. Cordover to determine whether or not Ms. Duncan could perform her duties as a PCT.

Despite these promises, Davita posted Ms. Duncan's position on November 1,

2013, three days before Ms. Duncan was scheduled to meet with Dr. Cordover.  On December 16, 2013, Ms. Duncan was released to return to work with no physical limitations, although her acid mixing restrictions remained.   On the 19th, Ms. Duncan spoke with Ms. Velasquez about returning to work now that she was no longer under any physical limitations.  Despite the fact that Ms. Duncan's position as the Prison Facility had not yet been filed, Ms. Velasquez told Ms. Duncan that she would need to apply for any open job at Davita for which she was qualified. Ms. Duncan told Ms. Velasquez that she had heard there were open positions in Leeds and Center Point.  Ms. Velasquez did not tell Ms. Duncan that her position at the Prison Facility had not been filed.  (Davita did not hire Ms. Duncan's replacement at the Prison until December 22, 2013.)  Further, Ms. Velasquez did not tell Ms. Duncan that there was an open position at the Ensley facility, where Duncan had previously worked.  In fact, Davita falsely told the EEOC that there were no open PCT positions at the Ensley facility.  But that statement was false.  Pl. Ex. 7, p. 4, Pl. Ex. 49, Int. Resp. 17; Doc. 109-9, DeJesus 187, 226-27, 243-44 (confirming that there was an open position in Ensley when Ms. Duncan's back restrictions were lifted; conceding that Davita's statement that there was no vacancy at Ensley is not true).

Further, despite being fully released to return to work, Davita refused to consider Ms. Duncan for any open position unless she could provide updated medical

documentation confirming that she could be exposed to acid - a condition which Davita knew Ms. Duncan could not meet.  This is not consistent with Davita's Permanent Return To Work policy, which provides that when a workers' compensation medical provider releases an employee to full duty, the Company will return that employee to her former position or, if that position is no longer available, the Company will attempt to reinstate her to the first available of like pay and status. Pl. Ex. 13; Def. Ex. 51, Velasquez 100-101. As an individual who suffered injuries on the job, this policy was applicable to Ms. Duncan.

Because Davita refused to reinstate Ms. Duncan to her position at the Prison, concealed the open Ensley position from Ms. Duncan, failed to follow its own policies, and refused to accommodate Ms. Duncan's asthma-related disability, Davita terminated her effective January 23, 2014.

C.     A Reasonable Jury Could Conclude That Davita Terminated Ms. Duncan Because She Engaged In Protected Activity.

Davita concedes that Ms. Duncan engaged in protected activity when she filed EEOC charges on November 1, 2013, and that she suffered two adverse employment actions thereafter: she was replaced at the Prison Clinic and subsequently terminated. Davita argues only that Ms. Duncan cannot prove causation.  Doc. 104, p. 36.

As to Ms. Duncan's replacement, Davita argues that it did not fill her position

at the Prison Clinic "until December 22, 2013, and only did so due to business needs." Doc. 104, p. 36. But, by December 22, 2013, Davita knew that Ms. Duncan had been medically cleared to return to her job at the Prison. Nevertheless, Davita refused to reinstate Ms. Duncan to this position. Instead, Davita told her she would not be considered for work in any facility where they mix acid unless Dr. Goldstein released her from his medical restrictions involving exposure to glycol acetic acid. Davita knew that Ms. Duncan could not meet this requirement. Furthermore, Davita intentionally withheld information from Ms. Duncan about the open Ensley position and then lied to the EEOC about that open position.

A reasonable juror, considering all of the evidence in the record, could conclude that Davita refused to reinstate Ms. Duncan to either her previous position or the Ensley position and then proceeded to terminate her because she had filed a charge of discrimination and challenged Davita's failure to accommodate her disabilities. A reasonable juror could also conclude that Davita achieved this retaliatory goal by constructing artificial roadblocks barring Ms. Duncan from being reinstated to her Prison position, by concealing open position from her, and by imposing discriminatory qualification standard which Davita knew would exclude her from consideration for any alternative positions for which she was qualified.

IV.   CONCLUSION

A reasonable jury could conclude that Ms. Duncan developed asthma as a result of being exposed to glycol acetic acid while at work.  She needed a simple accommodation in order to return to her job: remove from her the marginal function of mixing glycol acetic acid.  Davita refused to make this simple accommodation and kept Ms. Duncan off of work for five months.  Ultimately, Davita used various excuses as pretexts for terminating Ms. Duncan's employment, either because it no longer wanted to accommodate Ms. Duncan or because she had engaged in protected activity.  Because there are material facts in dispute and a reasonable jury could resolve this disputes in Ms. Duncan's favor, Defendant's motion for summary judgment should be denied.

Respectfully submitted,

 */s/ Kenneth D. Haynes*
Kenneth D. Haynes
Charles E. Guerrier
Attorneys for Sharon Duncan

**OF COUNSEL:**
HAYNES & HAYNES, P.C.
1600 Woodmere Drive
Birmingham, AL 35226
(205) 379-0377 Telephone
(205) 379-3572 Facsimile

CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of July, 2018, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system which will send

notification of such filing to the following:

Jenna M. Bedsole
Rachel V. Barlotta
Daisy C. Karlson
BAKER, DONELSON, BEARMAN
        CALDWELL & BERKOWITZ, P.C.
Wells Fargo Tower
420 North 20th Street, Suite 1400
Birmingham, Alabama 35203


                                        */s/ Charles E. Guerrier*
                                        Charles E. Guerrier
                                        Attorney for Sharon Duncan

42