# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| SHARON L. DUNCAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.:  4:15-cv-00743-SGC |
| | ) | |
| DAVITA HEALTHCARE | ) | |
| PARTNERS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>[1]

This matter is before the court on the motion for summary judgment filed by defendant, DaVita Healthcare Partners, Inc.  (Doc. 103).  Also pending is DaVita's motion to strike certain affidavits on which plaintiff, Sharon Duncan, relies in opposing the motion for summary judgment.  (Doc. 133).  Both motions are fully briefed and ripe for adjudication.  (Docs. 104-112, 116-126, 128, 132, 134, 135).  As explained below, the motion to strike is due to be granted in part, and the motion for summary judgment is due to be denied.

## I.     SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the *Federal Rules of Civil Procedure*, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and

---

[1] The parties have unanimously consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  (Doc. 12).

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *See id.* at 324.

The substantive law identifies which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id*. at 249.

## II.    SUMMARY JUDGMENT FACTS

DaVita operates multiple dialysis clinics in and around Birmingham.  As relevant here, DaVita operates a Birmingham East clinic ("Birmingham East"), an Ensley clinic ("Ensley"), a clinic inside St. Clair Prison ("St. Clair"), a Center Point clinic ("Center Point"), and a Leeds clinic ("Leeds").  As explained in more detail below, Duncan initially worked for DaVita at Birmingham East; she subsequently worked at Ensley and St. Clair.  (Doc. 104 at 3, 16-18).  In each of these clinics, Duncan worked as a Patient Care Technician ("PCT").  The PCT job description includes duties such as weighing patients to determine how much fluid to pull off, taking vital signs, checking access points, administering dialysis, and preparing equipment between patients.  (Doc. 128 at 12).

Performing dialysis requires several acid solutions, including a glycol acetic acid solution.  (Doc. 104 at 3).  At most DaVita facilities, including Birmingham East, Center Point, Leeds, and Ensley, PCTs prepare the glycol acetic acid by mixing chemical solutions; at St. Clair, glycol acetic acid is made by a different process which does not require PCTs to mix it.  (*Id.*; Doc. 128 at 9).  Mixing glycol acetic acid is not among the tasks enumerated in the PCT job description, but Duncan and all other PCTs were trained on how to mix it.  (Doc. 128 at 12).  However, Duncan also testified that not all PCTs were required to mix glycol acetic acid.  (Doc. 105-1 at 26).

3

Mixing glycol acetic acid creates potentially noxious or irritating fumes. (*See* Doc. 116-2 at 3). Accordingly, glycol acetic acid is prepared in a mixing room; at Birmingham East, a door separates the mixing room from the area where patients are treated. (*See id.*). PCTs at Birmingham East did not wear respirators when mixing glycol acetic acid, but the mixing room's ventilation system dissipated the fumes within approximately 30 minutes after the mixing was complete. (*Id.* at 3-4). At Birmingham East, glycol acetic acid was stored in a tank; when the supply dropped below 250 gallons, a PCT would mix a 100-gallon batch and add it to the tank. (*Id.* at 2-3). Duncan testified glycol acetic acid was mixed consistently, approximately three times per week. (Doc. 128 at 3; *see* Doc. 104 at 3; Doc. 132 at 2-3). Mixing a batch of glycol acetic acid took less than 30 minutes. (Doc. 116-2 at 4). Another PCT whose tenure at Birmingham East overlapped with Duncan's averred there were always enough PCTs on duty there that, if one PCT was unable to mix glycol acetic acid, another PCT could perform the task. (Doc.116-2 at 3-4).

## A. Duncan's Employment at Birmingham East

Duncan began working for DaVita as a PCT at Birmingham East on September 27, 2010. (*See* Doc. 104 at 3). Duncan received a positive evaluation in September 2011 and earned a merit increase. (Doc. 128 at 12-13).

### 1.     Exposure and Sensitization to Glycol Acetic Acid

On January 2, 2012, Duncan was transporting chemicals when a bottle of glycol acetic acid broke on the floor. (Doc. 104 at 5). When Duncan bent down to clean up the liquid, she inhaled the fumes and burned her face. (*Id.*). Duncan immediately had difficulty breathing and began vomiting. (*Id.*). Paramedics were summoned, and Duncan was transported to the St. Vincent's East emergency room via ambulance. (*Id.*). Emergency room personnel treated Duncan with Tylenol and cleared her to return to work the following day. (*Id.*; *see* Doc. 128 at 13). Treatment notes indicate Duncan was told to avoid chemical fumes for one week and to follow-up with her doctor. (Doc. 104 at 5; Doc. 128 at 4).

The following day, Duncan worked a ten-hour shift without incident. (Doc. 104 at 6). On January 4, 2012, Duncan saw Dr. Elliot Saltz, who advised her to avoid chemical fumes for a week, at which time she would be reevaluated. (Doc. 128 at 4). On January 13, 2012, Duncan saw Dr. Jonathan Moore, who said she could return to work but: (1) must take OSHA-recommended precautions when mixing glycol acetic acid; and (2) would need to "cease mixing chemicals if pneumonitis symptoms reoccur." (*Id.*).

After her facial burns healed, Duncan repeatedly attempted to mix glycol acetic acid, but she experienced breathing difficulties each time, requiring hospital treatment. (Doc. 128 at 4, 13). For example, on September 19, 2012, Duncan was

admitted to Trinity Hospital with respiratory distress and was diagnosed with acute dyspnea and anxiety. (*Id.* at 8). On September 21, 2012, Duncan again experienced shortness of breath while mixing acid at work; she was transported to the emergency room via ambulance. (*Id.*). Treatment records reflect Duncan reported "baseline asthma for years" that had been "well controlled." (*Id.*). At one point, Duncan experienced tightness in her chest when she was caring for patients, not while mixing glycol acetic acid. (Doc. 108-2 at 11).[2]

## 2. Dr. Goldstein's Treatment and Restrictions

Following the repeated respiratory episodes, Duncan requested to see a pulmonary specialist; DaVita granted the request. (Doc. 128 at 13; Doc. 104 at 9). On October 1, 2012, Duncan saw a pulmonologist, Dr. Allan Goldstein, on a workers' compensation referral. (Doc. 128 at 13; *see* Doc. 108-1). Dr. Goldstein concluded Duncan had been "sensitized to glycol acetic acid and should avoid that substance" because each of her pulmonary episodes was related to exposure. (Doc. 108-1).[3] Dr. Goldstein opined Duncan could return to work and perform dialysis

---

[2] Meanwhile, Duncan received two warnings regarding her job performance in June 2012. On June 14, 2012, Duncan received an initial written warning for failure to complete a disinfection log on two occasions. (Doc. 104 at 6-7). On June 28, 2012, Duncan received a final written warning for unprofessional and disrespectful conduct with patients and staff for incidents that occurred on June 14 and June 16, 2012. (*Id.* at 7-8).

[3] Duncan testified that she was due for a job performance review in September 2012, but Jacki Ward, a DaVita Group Facility Administrator, ignored Duncan's requests and prevented her from obtaining a review following the imposition of the acid mixing restriction. (Doc. 105-1 at 28-29; *see* Doc. 128 at 15; Doc. 104 at 4, n.2).

on patients but "should not be involved in mixing the materials that have caused the sensitization and the acute asthmatic attacks." (*Id.*). Duncan promptly delivered this note to DaVita. (Doc. 128 at 6-7). On October 4, 2012, Dr. Goldstein completed an FMLA health certification, concluding it would be medically necessary for Duncan to miss work during flare-ups. (Doc. 116-14 at 4; *see* Doc. 128 at 14).

On October 12, 13, and 15, 2012, Duncan missed work without providing a doctor's excuse. (Doc. 104 at 10). On October 15, 2012, DaVita's People Services Manager, Ed De Jesus, sent an email to a DaVita Disability Specialist, inquiring when additional information would be available from Duncan's doctor regarding her ability to withstand exposure to chemicals. (*Id.*). On October 16, 2012, Duncan was admitted to Trinity Medical Center for shortness of breath and chest pain. (*Id.*). On October 18, 2012, Dr. Goldstein saw Duncan, again noting she could return to work "as long as she is not exposed to glycol acetic acid." (*Id.*). Duncan understood her only limitation was that she could not mix glycol acetic acid. (*Id.* at 10-11).

From October 12 through October 23, 2012, DaVita took Duncan off the work schedule. (Doc. 128 at 14). When Dr. Goldstein saw Duncan on October 18, 2012, he noted she had been hospitalized two days earlier but was feeling much better after beginning treatment with Symbicort and her pulmonary functions were

normal.  (Doc. 120-2; *see* Doc. 128 at 14).  The following day, the manager at Birmingham East faxed other DaVita managers the restriction Dr. Goldstein imposed that Duncan not be exposed to glycol acetic acid.  (Doc. 116-15).

On October 22, 2012, Dr. Goldstein completed a form in which he advised Duncan to "avoid irritants especially glycol acetic acid."  (Doc. 108-6; *see* Doc. 104 at 11).  On October 23, 2012, Duncan's workers' compensation attorney wrote the Birmingham East manager, requesting DaVita accommodate her by allowing her to return as a PCT without mixing glycol acetic acid.  (Doc. 128 at 15).  On the same day, a DaVita Disability Specialist requested additional information from Dr. Goldstein regarding Duncan's restrictions; attached to the request was a questionnaire for Dr. Goldstein to complete.  (*Id.* at 14; Doc. 109-1 at 2).  On November 8, 2012, Dr. Goldstein responded, explaining Duncan "cannot mix the glycol acetic acid.  She can do all other aspects of her job," including all essential functions.  (Doc. 109-1 at 3).  Dr. Goldstein also explained Duncan must not be in the mixing room, which would cause bronchospasm.  (*Id.*).  Finally, Dr. Goldstein opined Duncan could perform dialysis and care for patients.  (*Id.*).  After reviewing Dr. Goldstein's notes, Duncan's manager at Birmingham East expressed confusion regarding whether Duncan could mix the other solutions required to operate a dialysis clinic.  (Doc. 104 at 12).

Meanwhile, Duncan returned to work on October 26, 2012. (Doc. 104 at 11). On November 16, 2012, Duncan was suspended for failing to ensure valves were open so a tank could be properly cleaned; the suspension lasted from November 17 until November 24, 2012. (*Id.* at 12). On November 19, 2012, Duncan's workers' compensation attorney again wrote DaVita, contending it refused to accommodate Duncan's restrictions and suspended her for actions which normally did not result in formal discipline. (Doc. 117-11). However, as DaVita notes, Duncan worked from October 26 through her November 16, 2012 suspension. (Doc. 132 at 5).

Although Duncan wanted to keep working, DaVita removed her from the schedule from November 2012 to April 29, 2013. (Doc. 128 at 16). Duncan offered to do additional work in lieu of mixing glycol acetic acid or to work on days when glycol acetic acid was not scheduled to be mixed. (Doc. 105-1 at 27). On December 5, 2012, DaVita managers, H.R. personnel, and disability specialists had a conference call with Duncan to evaluate job opportunities with DaVita that would accommodate her restriction. (*Compare* Doc. 128 at 11, *with* Doc. 104 at 24; *see* Doc. 105-1 at 44).

On December 10, 2012, Duncan again saw Dr. Goldstein, explaining DaVita was not satisfied with his prior explanations of her limitations and relaying additional questions. (*See* Doc. 109-4 at 3). Later that day, Dr. Goldstein sent a

terse letter to the DaVita Disability Specialist, expressing his displeasure that DaVita did not contact him directly. (*Id.* at 3-4). Dr. Goldstein explained, contrary to DaVita's understanding that Duncan could never enter the mixing room, Duncan was only restricted from entering the mixing room when glycol acetic acid was being made and for 30 minutes thereafter. (*Id.* at 3). Dr. Goldstein reiterated that Duncan was "quite capable of working" but "needs to avoid the glycol acetic acid while it is being made." (*Id.* at 4).

Birmingham East ran three shifts on Mondays, Wednesdays, and Fridays; on other days it ran two shifts. (Doc. 105-3 at 31-32). Jacki Ward testified that "at one point," the third shift at Birmingham East was staffed by only one PCT. (*Id.*). Accordingly, Jacki Ward testified that emergency situations could arise in which the PCT working the third shift would have to mix glycol acetic acid. (*Id.*). Examples of emergency situations include an acid tank malfunctioning and draining or changes to the acid's conductivity, making it unusable. (*Id.*).

On January 10, 2013, Sedgwick Claims Management Services, Inc., which administers DaVita's workers' compensation claims, wrote to Dr. Goldstein regarding Duncan's restrictions. (Doc. 105-5; *see* Doc. 104 at 13-14). The letter noted Duncan's exposure occurred during a spill, not while mixing glycol acetic acid. (Doc. 105-5 at 2). The letter also noted glycol acetic acid was present throughout the facility and was not limited to the mixing room. (*Id.* at 2). The

letter posed three questions to Dr. Goldstein: (1) whether Duncan became sensitized at the time of her exposure; (2) how exposure to glycol acetic acid would affect Duncan; and (3) what harm Duncan faced if exposed to glycol acetic acid. (*Id.*). Dr. Goldstein responded on March 1, 2013, by writing next to each question, in turn: (1) "yes"; (2) "causes asthma"; and (3) "worse asthma." (*Id.*; *see* Doc. 104 at 14).

On January 29, 2013, Dr. Goldstein noted that in the two months since Duncan last worked, she had experienced three or four episodes of acute bronchospasms. (Doc. 128 at 17; Doc. 122-2). Throughout January and February 2013, Duncan's workers' compensation attorney repeatedly wrote DaVita, requesting Duncan be allowed to return to work under the acid mixing restriction imposed by Dr. Goldstein. (Doc. 128 at 17; Doc. 116-3 at 3-4; Doc. 117-17).

On March 5, 2013, Duncan again saw Dr. Goldstein. Dr. Goldstein noted Duncan had not returned to work and stated he could not guarantee Duncan would not have another asthma attack. However, Dr. Goldstein opined Duncan could return to work "any time that her employer will allow." (Doc. 104 at 14).

### B.    Duncan's Employment at Ensley

DaVita employs a careers account through which Duncan could look for other jobs and receive notifications for openings in positions in which she was interested. (Doc. 104 at 15). Duncan could access the account and apply for jobs

on her cell phone. (*Id.*). DaVita searched for a clinic with enough PCTs and sufficient space to allow Duncan to work without exposure to the mixing of glycol acetic acid; it also sent Duncan information about interim positions for which she could apply. (*Id.*). DaVita identified Ensley as an option. (*Id.* at 15-16). Ensley had a larger mixing room than Birmingham East, operated only two shifts, and always had at least two PCTs working. (*Id.*). However, Ensley was farther from Duncan's home in St. Clair County. (*Id.* at 15; Doc. 128 at 9). DaVita offered Duncan a PCT position at Ensley; Duncan accepted and began working there on April 29, 2013. (Doc. 104 at 16).

When Duncan began working at Ensley, her employment and disciplinary history transferred with her. (Doc. 104 at 16). Jacki Ward told Duncan of this fact and stated that, if it had been up to her, Duncan would not have been accommodated and allowed to return to work. (Doc. 128 at 9). Jacki Ward also said she would be watching Duncan closely. (*Id.*). On May 2, 2013, after less than two weeks working at Ensley, Duncan emailed Ed De Jesus and expressed her interest in transferring to two other DaVita clinics: either St. Clair or Leeds. Duncan's interest in the transfer was driven by the longer commute to Ensley, decreased hours, and safety concerns. (Doc. 104 at 16). De Jesus responded that Leeds was not an option due to Duncan's acid mixing restriction. (*Id.* at 17). Duncan also contends De Jesus said she would not get another job with DaVita

unless Dr. Goldstein lifted the acid mixing restriction. (Doc. 128 at 9). On May 22, 2013, DaVita sent an email to Duncan regarding her interest in transferring to St. Clair and providing instructions on how to apply. (Doc. 104 at 17). During her time at Ensley, Duncan did not experience any asthmatic flare-ups at work; neither did she receive any disciplinary write-ups. (*Id.* at 18).

### C.     <u>Duncan's Employment at St. Clair and Back Injury</u>

Duncan applied for a PCT position at St. Clair on June 17, 2013. (Doc. 104 at 17-18). Under DaVita's policies, Duncan was not eligible for transfer to another clinic because she had been working at Ensley for less than six months and had been suspended within the past six months. (*Id.* at 17). However, Jacki Ward approved Duncan's transfer, and she began working as a PCT at St. Clair on July 1, 2013. (*Id.* at 18). Treatment notes from a contemporaneous check-up with Dr. Goldstein reveal she: (1) was doing well at work; (2) was working full-time; (3) did not have to mix acid in her new position; and (4) had not missed work due to asthma. (*Id.*).

Yvette Reaume was the Facility Administrator—and Duncan's supervisor—at St. Clair. (Doc. 104 at 18; Doc. 110-7 at 3). Yvette Reaume issued two verbal warnings to Duncan during her first month working at the prison clinic; (1) a July 12, 2013 warning for failing to draw lab work on three patients; and (2) a July 22, 2013 warning for failing to report to work and failing to call in. (Doc. 110-7 at 3,

13

5, 8).  Duncan disputes the substance of the July 22, 2013 warning, testifying she called St. Clair and spoke to another PCT, informing her she would not be at work. (Doc. 105-1 at 16).  Duncan testified her absence was doctor-excused following her trip to the emergency room for an asthma attack and that she faxed DaVita information regarding her emergency room visit.  (*Id.* at 47; *see* Doc. 128 at 9). During her time at St. Clair, Duncan complained about her hours and Jacki Ward; Duncan testified she complained to an H.R. manager that Jacki Ward was "short" with her and made her feel uncomfortable.  (Doc. 104 at 19).[4]  On July 29, 2019, Duncan asked the H.R. manager if she could return to work at Birmingham East. (*Id.* at 19).  DaVita claimed it could not transfer Duncan to Birmingham East because of her acid-mixing restriction.  (*Id.* at 20; Doc. 132 at 4).

On September 11, 2013, Duncan injured her back while bending over to pick up a roll of tape at St. Clair.  (Doc. 104 at 20).  On September 13, 2013, Duncan was treated at Brookwood Occupational Health for her back injury; she was assigned temporary work restrictions prohibiting her from: (1) lifting more than 15 pounds; (2) prolonged standing or walking; (3) bending; and (4) pushing or pulling more than 15 pounds.  (*Id.* at 20).  The parties dispute whether Duncan took medical leave or DaVita placed her on medical leave.  (*See id.*; Doc. 128 at 10). None of the cited evidence is conclusive on this point; for purposes of summary

---

[4] Duncan testified that her hours at St. Clair were decreased to 27-30 hours per week, down from 40-70 hours per week at Birmingham East.  (Doc. 128 at 19).

judgment, DaVita placed her on medical leave. It is undisputed that September 11, 2013, was Duncan's last day working at St. Clair.

DaVita's job description for a PCT requires the physical ability to: (1) lift up to 35 pounds unassisted; (2) repeatedly stand, sit, stoop, walk, stretch, and reach; and (3) use the full range of body motions. (Doc. 111-1 at 5). From the date of her injury through October 2013, these physical requirements for a PCT exceeded Duncan's restrictions. (Doc. 104 at 21; Doc. 111-2). Duncan sent documentation of her restrictions to Yvette Reaume and requested light duty; she told Duncan light duty was not available at St. Clair. (Doc. 104 at 21).

On October 3, 2013, Katherine Velasquez, DaVita's Senior Disability Specialist, called Duncan to tell her DaVita was still discussing how to bring her back to work with her restrictions. (Doc. 111-3 at 5-8). St. Clair operated differently from DaVita's other clinics by using inmate "runners" to assist wheelchair-bound patients to and from the clinic. (Doc. 104 at 21). DaVita contends the runners were only supposed to take the patients to and from the clinic door; as non-employees they were not allowed to enter the clinic. (*Id.* at 22). However, Duncan testified runners were allowed inside the clinic, where they provided physical assistance to inmates and did any heavy lifting. (Doc. 105-1 at 41).

Duncan asked Yvette Reaume and Katherine Velasquez to make a runner available to perform any physical tasks which would exceed her restrictions. (Doc. 104 at 22; *see* Doc. 128 at 10). DaVita declined to take these suggested actions and refused to allow Duncan to return to work until all restrictions were lifted. (Doc. 128 at 21; Doc. 105-1 at 43-44; Doc. 110-6 at 16; Doc. 117-25 at 12-21). Under DaVita's policies, whether an employee can be reasonably accommodated is decided by an employee's managers, namely the Facility Administrator and Group Administrator.[5] (Doc. 111-4 at 7; *see* Doc. 128 at 22). Velasquez coached the managers on what would be a reasonable accommodation and guided these discussions. (Doc. 111-4 at 7). Duncan told Velasquez that St. Clair used prisoners as runners to do the heavy lifting; when Velasquez relayed this information to Jacki Ward, she denied this assertion and stated the prisoners were not allowed in the clinic. (*See* Doc. 128 at 22).[6]

On October 18, 2013, Duncan saw Dr. Andrew Cordover, an orthopedic physician at Andrews Sports Medicine. (Doc. 128 at 20). At that visit, Dr. Cordover released Duncan to return to "light medium work," using a pre-printed form and checking a box indicating she could lift a maximum of 30 pounds. (Doc. 126-1 at 91). DaVita's policy provides that when an injured employee is released

---

[5] At St. Clair, these positions were occupied by Yvette Reaume and Jacki Ward.

[6] Meanwhile, Duncan saw Dr. Goldstein on October 10, 2013; the record reflects Duncan was doing well, with the exception of an acute asthmatic attack from July 21 to July 22, 2013, requiring emergency room treatment. (Doc. 128 at 23).

to return to light duty work, DaVita "will attempt to accommodate the restrictions in every way possible." (Doc. 128 at 20). During this period, Duncan's workers' compensation attorney continued writing DaVita to request accommodation of her temporary restrictions. (*Id.* at 23).

On October 31, 2013, Katherine Velasquez notified Duncan of information received from Sedgwick, indicating her restrictions would be in place until at least November 18, 2013. (Doc. 104 at 22). Duncan was scheduled to undergo an epidural steroid injection on November 4, 2013, and she was scheduled to have a follow-up appointment with Dr. Cordover two weeks thereafter; Dr. Cordover had indicated Duncan might be able to return to work after the follow-up appointment. (*Id.* at 22-23; *see* Doc. 128 at 23).[7] Velasquez further noted that, if Duncan was not medically released at that time, DaVita would post the St. Clair PCT position due to "current and pressing business needs." (Doc. 104 at 23). However, DaVita would wait until November 19, 2013, to fill the position. (*Id.*). DaVita contends it posted the St. Clair PCT position on November 1, 2013, but the cited evidence does not reveal when the posting occurred. (*Id.*; *see* Doc. 128 at 11; Doc. 111-5).

On November 1, 2013, Duncan filed an EEOC charge alleging DaVita discriminated against her on the basis of race and disability and retaliated against

---

[7] The November 4, 2013 epidural steroid injection provided relief from Duncan's symptoms. (Doc. 128 at 23). During her November 13, 2013 follow-up, Dr. Cordover recommended another epidural injection. (*Id.*). Dr. Cordover was not aware his 30 pound lifting restriction was keeping Duncan from working; he stated she could have lifted up to 35 pounds and would have said so. (*Id.*).

her for engaging in protected activity. (Doc. 104 at 23). On November 19, 2013, Katherine Velasquez informed Duncan that DaVita needed to fill the St. Clair PCT position. (*Id.*). One of DaVita's employees applied for the St. Clair position and was hired. (*Id.*).[8]

In December 2013, DaVita posted a position for a PCT position at its Leeds Clinic; Kristan Robinson—a DaVita employee splitting time at Birmingham East and Leeds—applied for the position on December 5, 2013. (Doc. 104 at 24). Davita interviewed Kristan Robinson on December 16, 2013. (*Id.* at 26). Also on December 16, 2013, Dr. Cordover released Duncan to return to work with no restrictions on lifting; her acid mixing restriction remained in effect. (Doc. 111-7; *see* Doc. 128 at 24).[9] Under DaVita's return to work policy, when an injured employee is released from restrictions, DaVita will either return the employee to their previous position or attempt to reinstate the employee to the first available similar position. (Doc. 128 at 26)

On December 19, 2013, Katherine Velasquez spoke on the phone with Duncan, informing her that, because of her release to return to work from her back

---

[8] Duncan contests that her replacement at St. Clair was a DaVita employee at the time of her hiring, citing Yvette Reaume's deposition testimony that she was hired from another dialysis company. (Doc. 128 at 11). However, Reaume's affidavit specifies the replacement was an internal hire; this conforms with DaVita's records. (Doc. 110-7 at 3-4; Doc. 111-5). In the end, any factual dispute regarding the replacement hire's prior employment status is immaterial.

[9] Approximately one month later, Dr. Cordover determined Duncan had achieved maximum medical improvement and had a 5% impairment rating. (Doc. 128 at 24).

injury, DaVita could not approve additional medical leave; Velasquez also said Duncan could apply within 30 days to any open position she could perform with her acid-mixing restriction.  (Doc. 104 at 25).  During this conversation, Velasquez also told Duncan there were no current openings which could accommodate her acid mixing restriction.  (Doc. 128 at 26).

On December 20, 2013, Velasquez left Duncan a message stating the Leeds position was still open; Velasquez advised Duncan to speak with her doctor to determine whether she could tolerate exposure to different brands of acid which the Leeds Clinic might begin using.  (Doc. 104 at 25).  Later that day, Duncan applied for the Leeds position.  (Doc. 112-2).  At some point, Duncan also applied for the Center Point PCT position.  (Doc. 104 at 26).  On December 23, 2013, DaVita offered Kristan Robinson the Leeds position.  (*Id.*).[10]

On January 7, 2014, Katherine Velasquez left Duncan a voicemail stating: (1) the Leeds position had been filled by an internal hire; (2) the Center Point position was still open; and (3) Duncan would not be considered for the Center Point position unless she provided additional medical documentation regarding the acid mixing restriction.  (Doc. 104 at 26).  On January 8, 2014, Velasquez sent Duncan a letter reminding her the 30 day window to apply for another position

---

[10]  Meanwhile, Duncan saw Dr. Goldstein on December 31, 2013; he noted she had experienced more asthmatic episodes, including one emergency room visit.  (Doc. 128 at 25).  Dr. Goldstein also noted Duncan's asthma worsens with temperature extremes and exposure to irritants.  (*Id.*).

would expire on January 22, 2014; she also noted Duncan would be terminated on January 23, 2014, if she did not secure a position prior to the deadline.  (*Id.*).  Duncan did not provide additional medical documentation regarding the acid mixing restriction.  (*Id.* at 27).  Duncan did not apply for additional positions, did not secure a position, and was terminated on January 23, 2014.  (*Id.*).[11]  On February 18, 2014, Duncan amended her EEOC charge, alleging DaVita discriminated against her on the basis of disability and retaliated against her for engaging in protected activity.  (Doc. 128 at 27; Doc. 116-6).

Duncan's asthma causes her shortness of breath and anxiety.  (Doc. 128 at 27).  Duncan suffers from asthma attacks for unknown reasons, unrelated to exposure to glycol acetic acid.  (*Id.*).  As Dr. Goldstein explained:

> Ms. Duncan has occupational asthma.  Though she has reached Maximal Medical Improvement, this does not mean she does not have asthma still.  It means that she is at the best asthma control level possible with her illness.  People with occupational asthma have a complication referred to as bronchial hyper-responsiveness.  This is a nonspecific entity and indicates substances that are considered irritants that never caused a problem in the past can cause an acute episode of asthma.

(Doc. 128 at 28; *See* Doc. 124-2 at 2).  Duncan subsequently developed sensitivity to colognes, cigarette smoke, diesel fumes, and household cleaners which did not

---

[11] Duncan also contends DaVita failed to inform her of an open PCT position at Ensley.  (Doc. 128 at 25).  DaVita filled that position with an external hire on January 27, 2014.  (*Id.*).

bother her prior to the glycol acetic acid exposure. (Doc. 128 at 28). Duncan has continued to experience asthmatic attacks since her termination. (*Id.*).

## III.  MOTION TO STRIKE

DaVita's motion to strike concerns portions of three affidavits on which Duncan relies in opposition to the motion for summary judgment. (Doc. 133). At issue are the affidavits of Elizabeth "Ann" Ethredge, Edward J. Berry, and Duncan.

### A.  <u>Elizabeth "Ann" Ethredge</u>[12]

Ethredge avers she worked as a PCT at Birmingham East and St. Clair from "approximately 2003 to 2013." (Doc. 116-2 at 2). During the time Ethredge worked at St. Clair, it was operated by Chardonnay Dialysis; by the time DaVita acquired St. Clair, Ethredge no longer worked there. (*Id.* at 2-3; *see* Doc. 133 at 5). As to Birmingham East, Ethredge's initial employment there was with a different company, Gambro; she recalls DaVita purchased the clinic from Gambro "in or around 2006." (Doc. 116-2 at 2-3). DaVita has offered unrebutted evidence that Ethredge worked for DaVita at Birmingham East from July 19, 2010, until September 6, 2012. (Doc. 133-1 at 2-3). Accordingly, Ethredge's employment at DaVita overlapped with Duncan's for nearly two years at Birmingham East, from Duncan's September 27, 2010 hiring until Ethredge's September 6, 2012

---

[12] The caption and body of the affidavit spells the affiant's last name as "Etheridge." (Doc. 116-2). However, the affiant signed her name as "Ethredge," mirroring the spelling in DaVita employment records. (*Id.* at 7; Doc. 133-1). Thus, the court assumes "Ethredge" is correct.

termination.  DaVita moves to strike portions of Ethredge's affidavit as irrelevant and containing hearsay, as well as lacking personal information, foundation, and specificity.  (Doc. 133 at 4-8).  The portions of Ethredge's affidavit to which DaVita objects are addressed in turn.

### 1.    Paragraph 2

First, DaVita objects to paragraph 2 as irrelevant and lacking specificity and personal knowledge.  (Doc. 133 at 5-6).  Paragraph 2 generally recounts Ethredge's employment history as a PCT at Birmingham East and St. Clair.  (Doc. 116-2 at 2-3).  To the extent the motion to strike takes issue with Ethredge's overstatement of the duration of her employment with DaVita, it is due to be granted in part.  This opinion will consider the duration of Ethredge's employment with DaVita as described in the preceding paragraph.  To the extent DaVita moves to strike paragraph 2 because Ethredge left her PCT job on September 6, 2012—after Duncan's exposure to glycol acetic acid, but two weeks before Duncan's first post-accident asthma attack at work—it is due to be denied.  As explained in more detail below, Ethredge's affidavit offers relevant, temporally proximate information regarding DaVita's operations at Birmingham East.  To the extent DaVita moves to strike portions of paragraph 2 concerning Chardonnay's operation of St. Clair, the motion is due to be granted.  As discussed in more detail

below, Chardonnay's operation of St. Clair, long before Duncan worked there, is irrelevant to the claims presented in this matter.

### 2. Paragraph 3

Paragraph 3 describes the acids used in dialysis and the logistics surrounding their preparation. (Doc. 116-2 at 3-4). DaVita moves to strike based on lack of specificity, foundation, and personal knowledge. (Doc. 133 at 6-7). To the extent DaVita moves to strike because Ethredge's statements generally describe her entire ten-year employment as a PCT, it is due to be granted in part. How previous owners of Birmingham East may have operated is irrelevant to the claims against DaVita. However, DaVita's own records show it employed Ethredge as a full-time PCT for over two years at Birmingham East. (Doc. 133-1). This experience gives Ethredge the personal knowledge to describe the operation of Birmingham East during the time she worked for DaVita.[13] Notably, Ethredge's employment with DaVita at Birmingham East overlapped with Duncan's for nearly two years—a time encompassing Duncan's initial sensitization to glycol acetic acid and ending mere weeks before Duncan began experiencing asthma attacks when she resumed mixing the acid. Moreover, Ethredge's statements explaining the logistics of mixing acid were based on her experience "[d]uring the time that [she] worked at

---

[13] This experience gives Ethredge the foundation to speak to the amount of time it would take to mix glycol acetic acid (less than 30 minutes) and the time it would take for the fumes to dissipate (approximately 30 minutes). (Doc. 116-2 at 4).

the Birmingham East facility." (Doc. 116-2 at 3). To the extent DaVita contends statements in paragraph 3 are due to be stricken because Ethredge was terminated prior to Duncan's alleged non-accommodation or because she does not attach patient census information to support implications about PCT staffing levels, the motion is due to be denied. The undersigned will consider the information in paragraph 3 as a description of operations at Birmingham East during Ethredge's employment there with DaVita.

### 3. Paragraphs 4 through 7

DaVita moves to strike paragraphs 4 through 7 as irrelevant, conclusory, speculative, hearsay, or otherwise inadmissible. (Doc. 133 at 7). DaVita's arguments are similar to those regarding paragraphs 2 and 3. For the same reasons addressed in the sections addressing paragraphs 2 and 3, the motion to strike will be granted to the extent it describes anything beyond DaVita's operation of Birmingham East during Ethredge's employment there. However, the motion to strike these paragraphs will be denied in all other respects.

### 4. Paragraphs 10 through 12

Paragraphs 10 through 12 describe operations at St. Clair when it was operated by Chardonnay, before DaVita acquired the clinic and years before Duncan worked there. (Doc. 116-2). Because these circumstances are irrelevant to

the claims presented here, the motion to strike will be granted and paragraphs 10 through 12 will be stricken.

### 5. Conclusion Regarding Ethredge's Affidavit

As explained above, DaVita's motion to strike portions of Ethredge's affidavit is **GRANTED IN PART** and **DENIED IN PART**.  (Doc. 133 at 4-7).  Specifically, the statements in paragraph 2, identified above, as well as the entirety of paragraphs 10 through 12, are **STRICKEN** as irrelevant.  (Doc. 116-2 at 2-3, 5-6).  Additionally, the statements in paragraphs 2-7 will only be considered as describing DaVita's operations at Birmingham East during Ethredge's employment from July 19, 2010, until September 6, 2012.  (Doc. 116-2 at 2-5).  The motion to strike Ethredge's affidavit is **DENIED** in all other respects.  (Doc. 133 at 4-7).

### B.   Edward J. Berry

Berry has been Duncan's workers' compensation attorney since 2012, following her initial exposure to glycol acetic acid.  Berry's affidavit attempts to authenticate and describe correspondence to and from DaVita, its workers' compensation administrator, and Davita's workers' compensation attorney regarding Duncan's attempts to return to work and potential accommodations following her respiratory injury and, later, her back injury.  (Doc. 116-3).

DaVita moves to strike six paragraphs of Berry's affidavit on the grounds they: (1) are not made on personal knowledge; (2) are speculative; (3) constitute

opinions and legal conclusions; and (4) describe settlement discussions. (Doc. 133 at 8-9). DaVita also objects to Duncan's use of statements in Berry's affidavit as evidence to oppose the motion for summary judgment, which DaVita contends constitutes hearsay. (Doc. 133 at 8). Neither party cites any law in support of their respective positions, with the exception of DaVita's passing reference to Rule 408 of the *Federal Rules of Evidence*. (*See* Doc. 133 at 8-9; Doc. 134 at 8-9; Doc. 135 at 5-6).

DaVita's arguments point to few specific statements in the affidavit to which it objects. To the extent DaVita objects to the affidavit on the basis of settlement discussions, the only specific statement to which it points—in its reply—is the conclusion of a November 19, 2012 letter from Berry to DaVita concerning Duncan's attempts to return to work following her asthmatic attacks in late 2012. (Doc. 135 at 6). The offending statement is: "Please consider this letter as a reasonable attempt to correct the trajectory of this matter." (*Id.*) (*citing* Doc. 116-21). Simply put, Berry's letter is not an offer of settlement; it simply requested DaVita allow Duncan to return to work.

DaVita also contends Berry's statement in an October 23, 2012 letter to Sedgwick Claims is refuted by other undisputed facts. (Doc. 133 at 8-9; Doc. 135 at 5). Specifically, DaVita takes issue with Berry's statement that DaVita removed Duncan from the schedule "on October 12, 2012 through October 25, 2012

because it could not accommodate the restrictions issued by Dr. Goldstein." (Doc. 116-3 at 12). Although not entirely clear, it appears DaVita contends this statement conflicts with the uncontested fact that Duncan did not report to work on October 12, through 14, 2012, and was hospitalized on October 16, 2012. (Doc. 133 at 8-9). But these two facts are not mutually exclusive, particularly under the summary judgment standard.

The only statement DaVita specifically identifies as constituting hearsay appears in a January 22, 2013 letter to its workers' compensation attorney, in which Berry states Jacki Ward told Duncan she was not allowed on DaVita's premises. (Doc. 135 at 5). Although DaVita did not identify this—or any other—specific instance of hearsay until its reply brief, Duncan has not sought leave to file a sur-reply to address its arguments. Accordingly, the foregoing statement will be stricken as inadmissible hearsay. (Doc. 116-3).

The only document DaVita specifically identifies as including Berry's legal conclusions is an October 23, 2012 letter to Sedgwick Claims. (Doc. 135 at 5). However, DaVita does not identify the legal conclusions it contends the letter includes. (*Id.*). Accordingly, while the motion to strike will not be granted on this point, this opinion does not rely on anything the court discerns as constituting a legal conclusion in the October 23, 2012 letter. (Doc. 116-18).

Finally, DaVita contends Duncan relies on an October 23, 2012 letter to the manager of Birmingham East to demonstrate Berry wrote her. (Doc. 133 at 9; Doc. 135 at 5-6) (*citing* Doc. 128 at 15). Because the manager was deposed in this matter, DaVita contends the deposition is the best evidence on the question. (Doc. 133 at 9). Under the Rule 56 standard, the court will not eschew one form of evidence for another, particularly on the rationale offered here. Accordingly, the motion to strike will be denied as to Duncan's citation to the October 23, 2012 letter.

As explained above, DaVita's motion to strike portions of Berry's affidavit is **GRANTED IN PART** and **DENIED IN PART**. (Doc. 133 at 8-9). Specifically, the statement in paragraph 6 of Berry's affidavit—and the original statement in his January 22, 2013 letter (Doc. 116-22 at 2)—that Jacki Ward would not allow Duncan on DaVita's premises is **STRICKEN** as hearsay. The motion to strike Berry's affidavit is **DENIED** in all other respects. (Doc. 133 at 8-9).

## C.    Duncan's Affidavit

Lastly, DaVita moves to strike portions of Duncan's affidavit concerning her use of inhalers to treat asthma. (Doc. 133 at 9-10).[14] Specifically, Duncan avers:

---

[14]  DaVita's motion to strike identifies the offending portion of the affidavit as paragraph 5. (Doc. 133 at 9; *see* Doc. 135 at 6). Duncan's statements concerning her use of inhalers appear in paragraph 6 of the affidavit. (Doc. 116-4 at 3-4). Additionally, paragraph 5 of Duncan's affidavit does not address her use of inhalers. (*Id.*). Accordingly, the undersigned assumes DaVita moves to strike paragraph 6 of Duncan's affidavit.

To treat the symptoms of asthma, I use both a Proair and Advair inhaler. The Proair inhaler is an emergency inhaler and the Advair inhaler is a maintenance inhaler that I use every day. Without using an inhaler, I experience asthmatic symptoms. I feel like I am not getting enough air, my throat feels like it is closing and my heart rate increases. I experience these symptoms regardless of any exposure to aggravating chemicals.

(Doc. 116-4 at 3-4). DaVita objects to this paragraph as conclusory, lacking foundation, conflicting with other evidence, and because it is the first time Duncan has presented it. (Doc. 133 at 10). To the extent DaVita objects due to the lack of objective medical evidence to support it, the undersigned is unaware of any authority requiring evidence to corroborate a party's averment concerning their use of medications. The same is true to the extent DaVita objects to the statement as conclusory or lacking foundation. Accordingly, the motion to strike portions of Duncan's affidavit is **DENIED**. (Doc. 133 at 9-10).

## IV. DISCUSSION

Duncan asserts claims under the Americans with Disabilities Act ("ADA") and for retaliation. These claims are addressed in turn.

### A. <u>ADA</u>

DaVita's motion for summary judgment addresses two potential bases for Duncan's disability discrimination claims: (1) her asthmatic condition; and (2) her back injury. (Doc. 104 at 28-37). Duncan's response explains she is not asserting a stand-alone ADA claim based on her back injury. (Doc. 128 at 38). Rather,

Duncan contends DaVita used her back injury as an excuse to terminate her, which was motivated by Duncan's asthma-related restrictions.  (*Id.*).  Accordingly, Duncan has abandoned any independent ADA claim based on her back injury.

A plaintiff asserting employment discrimination under the ADA must show: (1) she suffers from a disability; (2) she is a qualified individual with or without a reasonable accommodation; and (3) she was discriminated against because of her disability.  *Rossbach v. City of Miami*, 371 F.3d 1354, 1356-57 (11th Cir. 2004).  DaVita asserts Duncan cannot establish any of these *prima facie* requirements.  Each element is addressed in turn.

### 1.    Disability

The ADA defines a disability as "a physical or mental impairment that substantially limits one or more major life activities of [an] individual."  42 U.S.C. § 12102(1)(A).  Whether a condition qualifies as a disability is determined without considering "the ameliorative effects of mitigating measures."  *Id.* at § 12102(4)(E)(i).  Even an episodic condition can constitute a disability if it substantially limits a major life activity when symptomatic.  *Id.* at § 12102(4)(D).  Unsurprisingly, the ADA defines breathing as a "major life activity."  *Id.* at § 12102(2)(A).  Moreover, the regulations explain the term "substantially limits" is not an exacting standard.  29 C.F.R. § 1630.2(j)(1)(i) ("'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent

permitted by the terms of the ADA" and "is not meant to be a demanding standard"); 29 C.F.R. § 1630.2(j)(1)(ii) ("An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting."); 29 C.F.R. § 1630.2(j)(1)(iii) ("threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis"); *see Mazzeo v. Color Resolutions Intern., LLC,* 746 F.3d 1264, 1269 (11th Cir. 2014).

Courts sitting within the Eleventh Circuit have held that asthma can constitute a substantial limitation on the major life activity of breathing. *Wolfe v. Fla. Dep't of Corr.*, No. 10-0663, 2012 WL 4052334, at *2 (M.D. Fla. Sept. 14, 2012); *Brown v. Georgia Dept. of Corr.,* No. 07–0079, 2008 WL 795086 *3 (M.D. Ga. Mar. 4, 2008). Evidence in *Wolfe* included that the plaintiff, a state prisoner: (1) suffered daily breathing difficulties and frequent asthma attacks; (2) always carried a rescue inhaler, which he used multiple times each day; (3) sometimes needed additional clinical treatment; (4) repeatedly visited the prison medical clinic for breathing treatments; (5) underwent repeated overnight stays in the prison infirmary and hospitalizations; and (6) ultimately died following an acute asthma attack. 2012 WL 4052334 at *3. The plaintiff also presented evidence that his daily activities were restricted by his asthma, including that he: (1) avoided playing sports or exercising; (2) could not sing; and (3) could not work on the

landscaping crew or in the kitchen.  *Id.*   In response, the defendant pointed to evidence that the plaintiff: (1) played football and basketball; (2) worked jobs including air-conditioning repair, automotive care, car washing, and construction; (3) assisted with tasks including vacuuming, painting, washing dishes, and fixing electronics; (4) was physically able to commit armed burglary of an occupied dwelling, grand theft, and grant theft-auto; and (5) continued smoking cigarettes and marijuana.  The district court denied summary judgment, finding the plaintiff had presented sufficient evidence to create a genuine issue of material fact on the issue of disability.  *Id.*

Even under the summary judgment standard, Duncan's asthma is not as severe as the plaintiff's in *Wolfe*.  However, the undisputed facts establish Duncan suffered numerous asthma attacks following her sensitization to glycol acetic acid, including at least four requiring emergency room treatment, sought more routine medical treatment for asthma, and was prescribed medication to treat her asthma.  Additionally, Dr. Goldstein's treatment notes reflect Duncan continued to suffer asthma attacks, in both work and non-work settings.   Additionally, Duncan's affidavit states: (1) she uses multiple inhalers, including a maintenance inhaler administered daily; (2) without using her inhalers she experiences asthmatic symptoms, exhibiting shortness of breath, tightness in her throat, and increased heart rate; and (3) she suffers asthmatic symptoms even when she is not exposed to

chemical fumes. (Doc. 116-4 at 3-4). While DaVita's motion to strike contests Duncan's averments and argues they are not supported by the evidence, DaVita does not point to any testimony or other evidence flatly contradicting them.

Accordingly, under the summary judgment standard and in light of the liberal standard governing what constitutes a substantial limitation, Duncan's asthma constitutes a disability under the ADA.

## 2. Qualified Individual with a Disability

In order to be a qualified individual under the ADA, a plaintiff must be able to perform the "essential functions" of her job with or without a reasonable accommodation. 42 U.S.C. § 12111(8). The regulations define an essential function as "the fundamental job duties of the employment position," as opposed to "marginal functions." 29 C.F.R. § 1603.2(n)(1). "Whether a function is essential is evaluated on a case-by-case basis by examining a number of factors." *Davis v. Florida Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000). The evidence used to examine whether a particular function is essential include: (1) the employer's judgment as to which functions are essential; (2) written job descriptions; (3) the amount of time spent performing the function; (4) the consequences of the particular employee not performing the function; and (5) the experiences of past and current employees performing the job. *Id.*; 29 C.F.R. § 1630.2(n)(3).

Here, DaVita contends mixing glycol acetic acid was an essential function of the PCT position. While an employer's judgment regarding whether a function qualifies as essential is entitled to substantial weight, this factor is not dispositive. *Holly v. Clairson Indus., LLC*, 492 F.3d 1247, 1258 (11th Cir. 2007). Critically, mixing acid is not included in DaVita's PCT job description, clearly weighing in Duncan's favor. As to the remaining factors, Duncan has offered sufficient evidence to show mixing acid was a marginal function of a PCT. While mixing acid was performed at regular intervals at Birmingham East, it typically only occurred three times per week. Duncan has presented evidence that mixing the acid only took approximately 30 minutes on each occasion. The devotion of ninety minutes each week to mixing glycol acetic acid supports the conclusion it was a marginal function. While DaVita contends staffing levels at Birmingham East might give rise to situations in which Duncan would be the only PCT on duty and would have to mix glycol acetic acid in an emergency, Ethredge averred that, while working at Birmingham East, she never encountered this scenario. Additionally, Duncan testified that not every PCT was required to mix glycol acetic acid—the task was simply assigned by a Facility Administrator.

While Duncan may or may not be able to persuade a jury that mixing glycol acetic acid was a marginal function of a DaVita PCT at those clinics where it was prepared by employees, she has presented sufficient evidence to withstand

summary judgment on this issue. This is especially true in light of the Eleventh Circuit's indication that whether a particular function is essential is generally a question of fact. *Samson v. Fed. Exp. Corp.* 746 F.3d 1196, 1201 (11th Cir. 2014).

### 3. Adverse Employment Action

Finally, DaVita contends it satisfied its obligations under the ADA because it twice accommodated Duncan by: (1) finding a PCT opening at Ensley where she would not be required to mix glycol acetic acid; and (2) allowing her to transfer to St. Clair even though, under DaVita policies, she was not eligible for transfer. (Doc. 104 at 32). Reassignment to a vacant position may constitute a reasonable accommodation. 42 U.S.C. § 12111(9); *see Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997). However, whether transfer is a reasonable accommodation presupposes the employee cannot perform an essential function of her current position. *See Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1161-62 (10th Cir. 1999). Because there is a question of fact concerning whether mixing acid is an essential function of a PCT, it would be premature to find transfer was a reasonable accommodation. And even if the eventual transfer to Ensley in April 2013 was a reasonable accommodation, DaVita prevented Duncan from working at Birmingham East from November 2012 through April 2013. This constitutes an adverse employment action, satisfying Duncan's *prima facie* case, at least with regard to this four-month period.

It is true that DaVita ultimately transferred Duncan to Ensley and subsequently granted Duncan's request to transfer her to St. Clair. While a truly lateral transfer cannot constitute an adverse employment action, the Eleventh Circuit applies an objective "reasonable person" standard to determine whether a particular employment action is adverse. *Doe v. DeKalb Cty. School Dist.*, 145 F.3d 1441, 1448-49 (11th Cir. 1998). Under this objective standard, transfers resulting in lesser pay or arduous travel constitute adverse employment actions. *Id.* at 1452. Here, it is undisputed that Ensley was located farther from Duncan's home in St. Clair County. Additionally, it appears Duncan was scheduled for fewer hours[15] at both St. Clair and Ensley than when she worked at Birmingham East. (Doc. 107-5). Accordingly, Duncan has presented sufficient evidence to show that her transfer constituted an adverse employment action.

Regarding her eventual termination, Duncan contends DaVita used her back injury as an excuse to terminate her; she claims DaVita's actual motivation was her asthma and attendant acid-mixing restrictions. (Doc. 128 at 38-41). Whatever a jury might make of this theory, the undisputed facts establish: (1) Duncan applied to PCT positions at Leeds and Center Point; and (2) DaVita did not hire Duncan for either position; (3) DaVita rejected Duncan's application for Center Point on

---

[15] The records reflecting Duncan's time and attendance are difficult to interpret. However, they generally show that Duncan regularly worked overtime while at Birmingham East. (Doc. 107-5 at 6-11). Duncan never worked overtime at Ensley or St. Clair. (*Id.* at 12-14).

the basis of her inability to mix glycol acetic acid. DaVita also stated Duncan would not be able to work at other clinics due to the acid mixing restriction. Because there is a question of fact regarding whether mixing acid was an essential function of a PCT, DaVita is not entitled to summary judgment on Duncan's ADA claim.

### B. <u>Retaliation</u>

The ADA provides: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge . . . under [the ADA]." 42 U.S.C. § 12203(a). ADA retaliation claims are analyzed under the same framework as Title VII retaliation claims. *Stewart*, 117 F.3d at 1287. A plaintiff claiming retaliation must show: (1) she engaged in statutorily protected expression; (2) she suffered adverse employment action; and (3) a causal link between the two. *Id.*

Here, Duncan engaged in protected expression when she filed an EEOC charge on November 1, 2013, after her back injury. Following Duncan's EEOC charge, she suffered two adverse employment actions when DaVita replaced her at St. Clair and subsequently terminated her. (Doc. 104 at 38; Doc. 128 at 41). Accordingly, at issue here is causation. As the Supreme Court has observed: "Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e–2(m). This requires

proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). Accordingly, a plaintiff making a Title VII retaliation claim "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Id*. at 362.

In its motion for summary judgment, DaVita contends Duncan cannot show her EEOC complaint was the but-for cause of either her replacement at St. Clair or her ultimate termination. (Doc. 104 at 38). As to replacement, DaVita contends it had to fill Duncan's position at St. Clair due to business needs. (Doc. 104 at 38). As to termination, DaVita relies on Duncan's failure to apply for open positions which could accommodate her acid-mixing restriction. (*Id.* at 38-39).

Where an employer offers legitimate reasons for an employment decision, the employee bears the burden to show the proffered reasons are pretextual. *Damon v. Fleming Supermarkets of Fla., Inc.,* 196 F.3d 1354, 1361 (11th Cir. 1991). Temporal proximity between the protected activity and the adverse employment action is relevant to the inquiry but, without more, is not determinative of pretext. *Dates v. Frank Norton, LLC*, 190 F. Supp. 3d 1037, 1071 (N.D. Ala. 2016) (citing *Jackson v. Hennessy Auto*, 190 F. App'x 765, 768 (11th Cir. 2006).

Here, Duncan filed her EEOC charge on November 1, 2013. DaVita interviewed Duncan's replacement on November 19, 2013, and offered her the position—less than three weeks after Duncan's protected activity. DaVita terminated Duncan approximately two months later. This temporal proximity is not the only evidence of pretext. Indeed, DaVita acknowledges Duncan applied for PCT positions in Center Point and Leeds. DaVita's stated reasons for not hiring Duncan for these positions was her inability to mix glycol acetic acid. As noted previously, there are genuine issues of material fact regarding whether mixing acid was an essential function of a PCT.

Duncan has presented sufficient evidence to show DaVita's reasons for terminating her were pretextual. Accordingly, DaVita is not entitled to summary judgment on Duncan's retaliation claim.

## V.    CONCLUSION

For the foregoing reasons: (1) DaVita's motion to strike is **GRANTED IN PART** and **DENIED IN PART**, as discussed in Section III of this opinion (Doc. 133); and (2) DaVita's motion for summary judgment is **DENIED** due to genuine issues of material fact (Doc. 103). Additionally, Duncan's motion for a status conference is **DENIED WITHOUT PREJUDICE**. (Doc. 136).

**DONE** this 12th day of August, 2019.

STACI G. CORNELIUS
U.S. MAGISTRATE JUDGE